# United States Court of Appeals
## For the First Circuit

Nos. 06-1964, 06-2101

ARTEMIS COFFIN; JAMES MINGO; TERRENCE LYON; HAROLD SMITH;
ROBERT DEWITT; DUANE HANSCOM; JOSEPH GAGLIARDI, JR.;
TRINA VAZNIS; RAYMOND MACDONALD; ROBERT P. HEALEY;
BARRY BRYANT; LEE WHEATON; GEORGE BAKER; GALEN LANDER,
Individually and as Representatives of a Class of Persons
Similarly Situated,

Plaintiffs-Appellants/Cross-Appellees,

v.

BOWATER INCORPORATED; BOWATER LIFE INSURANCE PLAN; GROUP
PROTECTION FOR EMPLOYEES OF BOWATER INCORPORATED
GREAT NORTHERN INC. DIVISION; BOWATER INCORPORATED
POINT OF SERVICE MEDICAL BENEFITS PLAN;
BOWATER INCORPORATED BENEFIT PLAN,

Defendants-Appellees/Cross-Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Gene Carter, Senior U.S. District Judge]

Before

Torruella, Circuit Judge,
Tashima,* Senior Circuit Judge,
and Lipez, Circuit Judge.

Leon Dayan, with whom Douglas L. Greenfield, Abigail V.
Carter, Diane A. Khiel and Jonathan Beal were on brief, for
plaintiffs-appellants/cross-appellees.

---

*Of the Ninth Circuit, sitting by designation.

Andrew Pincus, with whom Reginald R. Goeke, Andrew E. Tauber, Mayer, Brown, Row & Maw LLP, and Richard G. Moon were on brief, for defendants-appellees/cross-appellants.

————————————————

September 7, 2007

————————————————

**LIPEZ, Circuit Judge**.  This case concerns the continuing liability of Bowater, Inc. for the health benefits of some of the retired workers of its subsidiary, Great Northern Paper, Inc. ("GNP"), after Bowater sold GNP to Inexcon in 1999.  Bowater claims that its responsibility for these benefits terminated either at the time of GNP's sale or in 2003, when Bowater consolidated its benefit plans under an umbrella plan whose coverage did not extend to GNP retirees.  A putative class of GNP retirees, whose claims for benefits Bowater denied, assert that neither the 1999 sale nor the 2003 plan consolidation met the procedural requirements for terminating a benefit plan under the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001-1461 ("ERISA"), which governs these benefit plans.  They claim that plan coverage did not end until April 2004.[1]

In addition, GNP retirees who belonged to various unions raise a claim under the Labor Management Relations Act, 29 U.S.C. § 141 ("LMRA"), arguing that Bowater's denial of benefits breached collective bargaining agreements ("CBA"s) entitling them to lifetime health coverage.  These plaintiffs argue that Bowater's 2004 termination of its responsibilities under ERISA had no effect on its continuing responsibility under the CBAs.

---

[1] All parties agree that Bowater terminated its responsibility for these benefit plans under ERISA on April 19, 2004, when its Board of Directors amended its benefit plan through a written document stating that GNP retirees were not eligible for benefits.

On cross-motions for summary judgment, the district court granted summary judgment to Bowater on the LMRA claim. It granted partial summary judgment to Bowater and partial summary judgment to plaintiffs on the ERISA claim, concluding that Bowater retained responsibility for the ERISA plans beyond GNP's sale, but only until its consolidated plan took effect on January 1, 2003. We agree with the district court and affirm.

## I.

We provide here only the most basic facts, reserving details for the particular discussions of each issue below. In 1992, Bowater acquired GNP from Georgia-Pacific Corp.[2] Following the acquisition, both unionized and non-unionized GNP employees received health benefits under ERISA plans. At the time of the acquisition, the CBAs between Georgia-Pacific and GNP's unionized workers were in the middle of their terms. Bowater expressly adopted these CBAs and it negotiated new contracts in 1995. As part of the contract negotiations, the parties agreed to substitute a managed health care plan for the previous health plan. Bowater was named as plan sponsor and plan administrator under both the original health plans and the managed care plan. In addition, each of these plans, described by a "summary plan description" as required by ERISA, allowed the plan sponsor to modify, amend or

---

[2] As part of the acquisition agreement, Georgia-Pacific retained responsibility for retiree benefits for pre-1992 retirees.

terminate the plan at any time. Because the plans are identical on these relevant characteristics, we do not distinguish between them in our analysis.[3]

In August 1999, Bowater sold GNP to Inexcon. Bowater explicitly retained responsibility for the pensions of GNP workers who had retired between 1992 and the date of sale, as reflected in section 2.05 of the Stock Purchase Agreement ("SPA"), which stated: "Seller shall retain . . . any and all liabilities arising under the GNP Pension Plans." As we discuss in detail below, there is no equally clear language allocating responsibility for the health benefits of GNP's retired workers. GNP paid these benefits after the sale and until about the time it declared bankruptcy in 2003. When plaintiffs sought benefits from Bowater thereafter, Bowater – as plan administrator – denied all claims, citing multiple grounds: (1) that GNP (and not Bowater) was responsible for those benefits even before GNP's sale to Inexcon; (2) that the terms of GNP's 1999 sale clearly stated that GNP (and not Bowater) retained responsibility for its retirees' health benefits; and (3) that a 2003 consolidation of Bowater's benefit plans effectively terminated any residual responsibility Bowater retained under the plans.

---

[3] Workers who retired after 1995 were covered by the Bowater Point of Service Medical Benefits Plan; certain workers who retired between 1992 and 1995 were covered under the Indemnity Retiree Basic Program or the Indemnity Retiree Comprehensive Program.

On December 31, 2003 fifteen GNP retirees filed this action in federal court on behalf of themselves, their beneficiaries and a class of 638 similarly situated retirees, seeking health benefits from Bowater. Plaintiffs raise claims under both ERISA and the LMRA.[4] Under the ERISA claim, workers who retired from both salaried and hourly positions seek health benefits from the date in 2003 when GNP refused to continue paying health benefits through April 19, 2004. See 29 U.S.C. § 1132(a). In addition, retired hourly workers have asserted a claim under § 301 of the LMRA, 29 U.S.C. § 185, alleging that Bowater failed to honor its obligations under various CBAs to provide them lifetime health benefits. Because some of these workers retired under pre-1999 CBAs and others retired under a CBA adopted in 1999 – which contained substantially different language regarding health benefits – the LMRA claims are split into two counts.[5]

On June 21, 2005, the court certified three classes: a single class representing all retired workers seeking relief under the ERISA claim and two classes representing former unionized

---

[4] The complaint also included a count alleging breach of fiduciary duty. The district court granted plaintiffs' unopposed motion to dismiss that claim.

[5] GNP employees were represented by six different unions and are thus governed by a variety of individual CBAs. However, the parties have proceeded as if the terms of the individual unions' pre-1999 CBAs are identical and the terms of their 1999 CBAs are identical. Therefore, aside from noting the distinction between pre-1999 and 1999 CBAs – we do not further distinguish between them.

hourly workers who retired before and after the adoption of the 1999 CBA, respectively.

Shortly after class certification, Bowater filed a motion for summary judgment on all claims and plaintiffs filed a cross-motion for summary judgment on the ERISA claim. In a thorough opinion, the district court granted Bowater's motion on the LMRA claims, having found that neither the pre-1999 CBAs nor the 1999 CBAs provided for lifetime benefits. It granted plaintiffs' cross-motion on the ERISA claim through January 2003, but granted summary judgment to Bowater for the period thereafter, finding that: (1) Bowater remained the sponsor of the health plans after GNP's sale; (2) steps taken by Bowater during the sale did not divest it of responsibility for these benefits; and (3) Bowater's January 2003 consolidation of benefits could reasonably have been viewed by the benefits program administrator as having terminated Bowater's responsibility to GNP's retirees. The district court then approved a joint stipulation that the amount owed for the period prior to January 1, 2003 amounted to $62,000 and entered its final judgment. Both sides appealed.[6]

## II.

Bowater and plaintiffs find fault with the district court's determination that Bowater's responsibility under ERISA

---

[6] On appeal, Bowater did not renew its argument that it had never been responsible for benefits to GNP employees under the ERISA plans.

ended when it consolidated its benefit plans in 2003. Bowater insists that its responsibility ended in 1999, when it sold GNP to Inexcon. Plaintiffs argue that Bowater's responsibility did not end until 2004.

We review a district court's grant of summary judgment de novo, construing the facts in the light most favorable to the party opposing the motion. Int'l Strategies Group, Ltd. v. Greenberg Traurig, LLP, 482 F.3d 1, 6 (1st Cir. 2007). Summary judgment is appropriate where "there is no genuine issue as to any material fact and [] the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). For the reasons we describe in section II.C.1, we apply de novo review to the benefit plan administrator's determination of eligibility for benefits under the terms of the plan, even though the plan documents themselves afford the administrator substantial deference. See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989). Where the administrator's determination of eligibility depends upon an interpretation of non-plan documents (in this case, the SPA), our review is also de novo. Firestone, 489 U.S. at 112.[7]

It is well-established that ERISA does not prevent employers from adopting, modifying or terminating welfare plans at any time and for any reason. Curtiss-Wright Corp. v.

---

[7] Bowater concedes that we owe no deference to its interpretation of the documents related to GNP's sale to Inexcon as plan administrator.

-8-

Schoonejongen, 514 U.S. 73, 78 (1995).[8]  However, it requires that employers meet certain procedural standards when they do so.  Id. at 82-83.  In particular, ERISA requires that qualifying benefit plans "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan," 29 U.S.C. § 1102(b)(3).  In addition, such plans must be "maintained pursuant to a written instrument" that provides "for one or more named fiduciaries" who have "authority to control and manage the operation and administration of the plan," id., § 1102(a)(1), and the fiduciary must act "in accordance with the documents and instruments governing the plan," id., § 1104(a)(1)(D).  We have interpreted this language to require that the amendment or termination of written ERISA plans be accomplished through a written document, Bellino v. Schlumberger Techs., Inc., 944 F.2d 26, 33 (1st Cir. 1991) (citing Frank v. Cold Indust. Inc., 910 F.2d 90, 98 (3d Cir. 1990)), and executed by a party authorized to effect such amendment or termination, cf. Law v. Ernst & Young, 956 F.2d 364, 370 n.9 (1st Cir. 1992).

---

[8] This latitude contrasts with ERISA's tighter regulation of pension plans.  See, e.g., Balestracci v. NSTAR Elec. & Gas Corp., 449 F.3d 224, 229-30 (1st Cir. 2006) (discussing the distinction under ERISA between welfare benefit plans and pension plans, which are "subject to strict vesting requirements").

Each of Bowater's benefit plans includes language allowing Bowater to terminate or amend the plans at any time.[9] Through various board resolutions, Bowater authorized its Chief Executive Officer, the Vice President for Human Resources, and its Chief Financial Officer to take such action.[10] These provisions do not specify any particular steps that must be taken to effectuate a termination or amendment. The Supreme Court has held that such general clauses meet the requirements of 29 U.S.C. § 1102(b)(3). Curtiss-Wright, 514 U.S. at 75. In so concluding, the Court made several observations about the important goals served by ERISA's

---

[9] The indemnity plan states:

[Bowater] reserves the right to terminate, suspend, withdraw, amend or modify the Plan at any time. Any such change or termination in benefits (a) will be based solely on the decision of the Director of Employee Benefits and (b) may apply to active Employees, future retirees and current retirees as either separate groups or as one group.

The managed care plan states:

[Bowater], in its sole discretion, may at any time modify or amend the provisions, terms and conditions of the Plan or may at any time terminate the Plan without the consent of any Participant or any other beneficiary under the Plan.

It further specifies that these terms and conditions "may not be modified by any oral statement."

[10] A 1997 board resolution authorized Bowater's Chief Executive Officer and its Vice President for Human Resources to amend or terminate the Plans. A 1999 board resolution extended authority to the Chief Financial Officer to amend or terminate "any and all retirement, compensatory or welfare benefits plans" in order to further the consummation of the transaction selling GNP to Inexcon.

procedural requirements. In particular, they "increase[] the likelihood that proposed plan amendments, which are fairly serious events, are recognized as such and given the special consideration they deserve." Id. at 82-83. They also "enable[] plan administrators . . . to have a mechanism for sorting out, from among the occasional corporate communications that pass through their offices and that conflict with the existing plan terms, the bona fide amendments from those that are not." Id. Finally, requiring that every benefit plan be maintained pursuant to a written instrument "enable[s] beneficiaries to learn their rights and obligations under the plan at any time." Id. at 83.

In light of these goals, several circuit courts have held that only those written documents that clearly indicate that a plan is being changed or terminated meet ERISA's procedural requirements. The Fifth Circuit was the first court to articulate this principle in Borst v. Chevron Corp., 36 F.3d 1308, 1323 (5th Cir. 1994), where it explained that – for the same reasons that an "oral agreement cannot sustain a cause of action under ERISA" – neither can "written modifications or promises which are not, and do not purport to be, formal amendments of a plan." See also Kalda v. Sioux Valley Physician Partners, Inc., 481 F.3d 639, 648 (8th Cir. 2007); Sprague v. General Motors Corp., 133 F.3d 388, 403 (6th Cir. 1998). Our precedent also recognizes that "Congress intended ERISA insurers to speak clearly, in plain language, to plan

-11-

recipients." Glista v. UNUM Life Ins. Co. of Am., 378 F.3d 113, 132 (1st Cir. 2004).

The question before us is whether Bowater's actions in its 1999 sale of GNP or in its 2003 plan consolidation complied with ERISA's requirements and terminated its responsibilities for these ERISA plans.  The principles outlined above guide our review.

**A.  The Effect of GNP's Sale to Inexcon**

Bowater advances two related arguments to support its position that its responsibility for benefits under ERISA terminated when it sold GNP to Inexcon in 1999.  First, it argues that the act of selling a subsidiary – in and of itself – terminates a parent company's responsibilities for such benefits. Second, it argues that even if we reject such an "automatic termination" rule, the particular documents and actions through which Bowater sold GNP ended its obligations.  Plaintiffs counter that the case law does not support a per se rule automatically terminating a parent company's benefit responsibilities upon sale of a subsidiary and that such a rule would undermine the procedural protections afforded by ERISA.  In addition, they argue that neither the terms of the SPA nor any other documents or actions related to the sale of GNP to Inexcon fulfilled these procedural requirements.  The district court adopted plaintiffs' position on both contentions.  We review these conclusions de novo.  Having conducted such review, we agree with plaintiffs and the district

court that the 1999 sale did not terminate Bowater's responsibilities under its ERISA health and benefit plans.

Bowater begins its argument for an "automatic termination" rule by noting that ERISA does not prescribe particular steps that must be taken to terminate a welfare plan. In this absence, Bowater continues, courts have found that, when an employer's action eliminates any of the features required by ERISA – e.g., mechanisms for administering and funding the plan – that action also terminates the plan. Bowater concludes that because the sale of a subsidiary typically eliminates one or more "requisite features" of a welfare plan sponsored by the subsidiary's former parent, the sale of the subsidiary generally terminates any such plan. Bowater also invokes case law for the proposition that a parent company's welfare plan is "terminated by operation of law with respect to the employees of a subsidiary when the parent sells the subsidiary by means of a duly authorized written instrument," citing in particular Chiles v. Ceridian Corp., 95 F.3d 1505, 1516 (10th Cir. 1996). See also Sejman v. Warner-Lambert Co., 889 F.2d 1346 (4th Cir. 1989); Conkin v. CNF Transp., Inc., No. 03-CV-1058-J, 2004 U.S. Dist. LEXIS 15434 (D. Wyo. May 4, 2004). Finally, Bowater argues that an automatic termination rule is consistent with ERISA's ultimate goal of encouraging employers to establish and maintain welfare plans. Bowater contends that allowing employees of a former subsidiary to claim benefits under

the former parent's welfare plan might cause parent corporations to avoid offering such benefits in the first instance.

We disagree with each link in this logical chain. Although Bowater is correct that parent companies tend to terminate ERISA plans when selling a subsidiary, there is nothing automatic about this correlation. Indeed, the three cases Bowater cites in support of an automatic termination rule are factually distinguishable from the instant case because each case involved the sale of a subsidiary with attendant circumstances that met ERISA's procedural requirements.

In Chiles, the Tenth Circuit found that a parent company's long-term disability plan was terminated by sale of the subsidiary where the buyer instituted a replacement benefit plan, appointed new trustees to oversee the new plan, the buyer became the new plan's administrator, the seller transferred money to fund the new plan and, after the transfer, the buyer assumed all of the seller's obligations with respect to the plan beneficiaries. 95 F.3d at 1515-16. In addition, the court noted that the original plan's master document clearly stated that the plan terminated for each participant "on the date he or she ceases to be an employee of [the parent] or one of its wholly-owned subsidiaries." Id. at 1516 n.11.

In Sejman, the Fourth Circuit found that a parent company did not retain responsibility for severance benefits to its former

employees after selling its subsidiary where: (1) the parent specifically amended its plan to clarify that severance benefits would not be available to employees who had the opportunity to continue working for the acquiring company; and (2) the severance policy's text specified that, in order to be eligible for benefits, "the claimant had to be both an employee of [the parent] and 'terminated by [the parent] as a result of job elimination, work performance, or other reasons of [the parent's] convenience.'" 889 F.2d at 1349 (emphasis omitted). Because the acquirer – not the parent – had terminated the workers' employment, this specific language established that the employees were not covered by the parent's plan. Id. at 1350.

Finally, in Conkin, the district court found that the sale of a subsidiary terminated the parent's welfare benefit responsibilities where: (1) an Employee Benefit Matters Agreement announced that the subsidiary's employees immediately ceased participation in the seller's benefit plans, (2) the buyer set up new welfare benefits for its employees and the retirees of its new acquisition, and (3) the seller transferred sufficient assets from its own retirement plan to the newly created retirement plan of the buyer to cover the accrued benefits of its plan's participants. 2004 U.S. Dist. LEXIS 15434, at *18-20.

In none of these cases did the mere fact of a sale automatically terminate a parent company's responsibility for its

subsidiary's employee welfare benefit plan. To the contrary, they illustrate that companies tend explicitly to terminate benefit plans in the process of selling a subsidiary. In each of these cases, the language of the agreements and the corresponding changes to plan documents were sufficiently clear to alert employees that the parent was terminating responsibility for its welfare benefits upon the sale of the subsidiary. Thus, they met ERISA's minimal procedural requirements. As we will explain below, Bowater did not meet these requirements when it sold GNP.

Bowater's argument that an automatic termination rule best serves ERISA's goals is also unpersuasive. While it is true, as Bowater emphasizes, that "[o]ne of Congress's intentions in enacting ERISA . . . was to encourage the growth of private employee benefit plans," Wolf v. Reliance Std. Life Ins. Co., 71 F.3d 444, 447 (1st Cir. 1995), we have also held that Congress intended that ERISA plan beneficiaries receive clear information about their plans, see Glista, 378 F.3d at 132. Bowater overreaches with its argument that requiring such clear information might discourage employers from adopting ERISA plans for fear of unexpected outcomes. In our view, requiring parent companies to clarify their responsibility for welfare benefits upon the sale of a subsidiary is a modest requirement, fully compatible with ERISA's substantive and procedural aims.

## B. GNP's Sale Documents

Bowater next argues that, even if the sale itself did not end its benefit responsibilities, the SPA governing Bowater's sale of GNP to Inexcon clearly did so. Because the SPA was both written and signed by a party duly authorized to amend or terminate its benefit plan (i.e., Bowater's Chief Financial Officer), Bowater contends that it satisfies ERISA's procedural requirements. While plaintiffs agree that the SPA was written and signed by a properly identified designee, they argue that the SPA did not effectuate either a termination or amendment of Bowater's responsibility under the plans because it did not purport to do so. We agree.

Bowater argues that the SPA transfers the obligation to fund the ERISA plans from Bowater to GNP, thereby amending the plans. It relies on language in section 4.12 of the SPA, which reads:

> No Undisclosed Liabilities. Except as set forth in Section 4.12 of the Disclosure Schedule, and except for the Retained Liabilities, GNP has no known liabilities or obligations of any nature . . . other than (i) the liabilities and obligations to the extent reflected in the Base Balance Sheet or the Net Working Capital Certificate . . . (iv) the liabilities and obligations in any of the documents specifically identified in any Section of the Disclosure Schedule, except to the extent within the Knowledge of Seller (after no inquiry by Seller) and not disclosed by Seller herein or in the Disclosure Schedule (collectively, with the exception of Retained Liabilities, the "Assumed Liabilities").

Section 4.20(a) of the Disclosure Schedule lists the benefit plans under which plaintiffs make their claims. Taken together, Bowater argues, these documents effectively transfer responsibility for GNP's employees' health benefits from Bowater to GNP. Bowater further argues that plaintiffs are wrong to suggest that a document must invoke the "magic words" "amend" or "terminate" in order to effectuate a change to a welfare benefit plan.

We agree with this principle; however, irrespective of the failure to use the words "amend" or "terminate," we find this SPA language insufficient to meet ERISA's requirements because the SPA fails to convey that the agreement is amending or terminating the plans. Therefore, it does not enable the parties to "sort[] out . . . the bona fide amendments from those that are not," or allow them to "learn their rights and obligations under the plan at any time," as the Supreme Court envisioned in Curtiss-Wright, 514 U.S. at 82-83. See also Borst, 36 F.3d at 1323.

Section 4.12 of the SPA reflects Bowater's understanding that Inexcon was purchasing a subsidiary – GNP – with "liabilities and obligations . . . specifically identified in any Section of the Disclosure Schedule." The benefit plans at issue here are listed in Section 4.20(a) of the Disclosure Schedule. However, the SPA itself does not explicitly transfer those liabilities from Bowater to GNP. It also does not expressly terminate Bowater's responsibility for those benefits. Finally, even if this language

-18-

more clearly terminated Bowater's responsibility for health benefits, the language is embedded in a disclosure provision, where one would not normally look for such a termination. Upon reading this SPA language, one might expect to find a separate document in which such a transfer or termination took place; however, Bowater points to no such document.[11] Indeed, Bowater concedes that it did not execute any document – other than the SPA – that amended or terminated its responsibility for the benefit plans in connection with the 1999 sale.

Bowater argues that a document claiming to amend or terminate an ERISA plan need not be labeled as such, citing a string of cases in support. See Halliburton Co. Benefits Comm. v. Graves, 463 F.3d 360, 372 (5th Cir. 2006) ("[A] provision in a merger agreement could amend a welfare plan, even if it is not labeled as a plan amendment."); Allison v. Bank One-Denver, 289 F.3d 1223, 1235 (10th Cir. 2002) (holding that a Plan Advisory Committee's memorandum could serve as a plan amendment if it met the criteria of the plan's amendment procedure); Aldridge v. Lily-

_____

[11] Interestingly, the "Closing Document Checklist" provided by the parties in their joint appendix lists a "GNP Benefit Plan Side Letter Agreement," but that document is not provided. The "Closing Memorandum," listing actions taken and the documents delivered in connection with the sale of GNP, also notes that, "[o]n July 28, 1999, the Board of Directors of Seller took all corporate action necessary to authorize the Purchase Agreement and the transactions contemplated thereby." The record before us contains no evidence that a termination or amendment to the plan was a part of such "corporate action."

Tulip, Inc., 40 F.3d 1202, 1210 (11th Cir. 1994) (finding that adoption of a resolution by a corporation's board of directors may terminate a plan); Horn v. Berdon, Inc. Defined Benefit Pension Plan, 938 F.2d 125, 127 (9th Cir. 1991) (holding that a resolution by the Corporation's Board of Directors can serve to amend a plan). While these cases support the proposition that a welfare benefit plan may be amended or terminated through a document not itself labeled as an amendment or termination, the pertinent language in each case clearly conveyed that such a change was occurring. That is not true here.

In Aldridge and Horn, the board resolutions met the ERISA procedural criteria: they were written documents, signed by parties with authority to amend or terminate the plans; they followed the amendment or termination procedures laid out in the plans themselves; and, most importantly, each resolution indicated exactly how it would alter the plan. See Aldridge, 40 F.3d at 1205 n.2 ("The resolution reads as follows: 'II. Termination of the Retirement Plan [] WHEREAS, The Corporation deems it desirable to terminate the Retirement Plan . . . NOW THEREFORE BE IT RESOLVED, That the Retirement Plan be and hereby is terminated . . . .'"); Horn, 938 F.2d at 127 ("[The 'Board'] adopted two resolutions in anticipation of the sale . . . . The first declared the Plan would terminate . . . . The second amended the Plan to provide each

beneficiary with all benefits accrued as of [a certain date], and to eliminate any additional benefits accruing thereafter.").

More tellingly, Halliburton and Allison – while they found that a merger or plan advisory committee memorandum could amend a plan – ultimately determined that the particular actions taken in those cases failed to qualify as plan amendments. In Halliburton, the Fifth Circuit found that Halliburton did not, through the merger agreement, assume all rights and responsibilities for the employee benefit plans of the corporation that had merged into its subsidiary. Instead, the court concluded that the obligation arose three months later when Halliburton entered a separate agreement through which it explicitly agreed to assume, adopt and amend the company's employee benefit plans. 463 F.3d at 371 & n.7. In Allison, the court determined that a unanimously approved Advisory Committee memorandum was insufficient to amend the plan to turn it into a participant-directed plan where the plan contained specific procedures for such a conversion. Instead, the court characterized the resolution as an "insufficient step in performing the requirements" laid out in the plan for converting to a participant-directed plan. 289 F.3d at 1234. The court went on to say: "Resort to a plan's terms in the event of a dispute should not require the prescience of a clairvoyant as to whether an amendment has occurred. We have repeatedly rejected

efforts to stray from the express terms of a plan, regardless of whom those express terms may benefit." Id. at 1236.

We also note that in Bellino, 944 F.2d at 33 n.8, we refused to consider a letter the company sent to workers that purported to explain its severance policy and that included new terms as an amendment to the company's severance plan. There was no explicit statement that the letter itself was intended to change those terms. We thus drew a distinction between written documents that suggest an amendment or termination has occurred and documents that clearly purport to and actually succeed in amending or terminating an ERISA plan.

While Bowater is thus correct that it could have amended or terminated its plan in its SPA with Inexcon, the language of that document did not clearly do so. See also Kalda, 481 F.3d at 647-48 (rejecting the argument that the amendment of balance sheets reflecting the company's plan constituted a plan amendment despite the fact that they were written and approved by an authorized party); Sprague, 133 F.3d at 403 (rejecting plaintiffs' written statements of acceptance that contained changed plan terms as plan amendments because the documents did not purport to amend the plan). Moreover, the original plan documents – which named Bowater as plan administrator and plan sponsor – remained in place and no new responsible parties were identified by Bowater. Where the plan continued to list Bowater as plan sponsor and administrator and the

language of the SPA did not expressly terminate Bowater's responsibility, the fact that Bowater presumed in the SPA a transfer of responsibility to GNP did not meet ERISA requirements and therefore failed to accomplish such a transfer.

Finally, we note that this outcome does not create an onerous burden on plan sponsors under ERISA. As all parties here concede, Bowater finally terminated its responsibility under these benefit plans on April 19, 2004, when Bowater's Board of Directors amended its benefit plan to clarify that

> no individual who is an employee or former employee of [GNP] . . . shall be eligible to participate in the Plan or any separate Benefit Program under the Plan . . . such Plan, Benefit Program, predecessor and other programs and arrangements, as applied to GNP . . . being terminated as of the date of the sale of GNP to Inexcon.

Thus, while ERISA does not require employers to meet difficult standards in order to amend a welfare benefit plan, it does provide for minimal procedures that must be followed. That is, an ERISA plan amendment must be in writing; it must be executed by a party authorized to amend the plan; the language of the amendment must clearly alert the parties that the plan is being amended; and the amendment must meet any other requirements laid out for such amendments in the plan's governing documents. This insistence on specificity ensures that disputes between employees and their employers may be resolved by reference to the documents that govern the plan.

## C.  The 2003 Consolidation of Bowater's Benefit Plans

Bowater is a large corporate conglomerate that employs roughly 7,000 people and operates pulp and paper mills and related operations at several locations in five different states (as well as internationally).  Effective January 1, 2003, Bowater established the Bowater Incorporated Benefit Plan ("BIBP") as a unified plan to replace the various plans under which its employees received health and welfare benefits.  At least in part, this consolidated plan was adopted to ease the administrative burden of filing separate tax returns and ERISA-mandated forms for each of Bowater's benefit plans.[12]  Bowater, as plan administrator, determined that BIBP's adoption effectively terminated its liability under its previous health and benefit plans.  The district court, reviewing this decision under the traditional abuse of discretion standard, affirmed that decision.  Plaintiffs argue that BIBP's language cannot reasonably be construed to effectuate such a termination.  Before delving into this debate, we must determine the correct standard under which we review Bowater's decision in light of recent developments in this circuit relating to the standard of review in ERISA cases such as this one.

---

[12] This intention is clear from the language of the BIBP itself, which states: "All Benefit Programs offered under the Plan shall constitute a single plan for purposes of the annual reporting requirements of the [Internal Revenue] Code and ERISA."

1.  <u>Standard of Review</u>

We have traditionally reviewed a denial of benefits under an ERISA plan for abuse of discretion where the plan document itself grants the plan administrator discretion to determine eligibility or to construe the terms of the plan. <u>Firestone</u>, 489 U.S. at 115. Where the plan administrator operates under a conflict of interest, i.e., where the plan administrator is also the plan sponsor and therefore stands to gain from each dollar of benefits it denies to claimants, we have reviewed the administrator's interpretation of plan terms and eligibility for abuse of discretion, but with "more bite," placing "special emphasis on reasonableness." <u>Doyle</u> v. <u>Paul Revere Life Ins. Co.</u>, 144 F.3d 181, 184 (1st Cir. 1998).

However, since the district court issued its decision in this case, we have issued a decision, <u>Denmark</u> v. <u>Liberty Life Assur. Co.</u>, 481 F.3d 16, 19 (1st Cir. 2007), which calls into question the appropriate standard of review for ERISA cases involving structural conflicts such as those that exist in this case. In <u>Denmark</u>, two members of the court expressed their unease with the traditional standard of review in these cases and urged the court to reconsider this issue in an en banc proceeding. A petition for rehearing en banc that asks the court to reconsider the standard of review in ERISA cases involving structural conflicts of interest is currently pending before this court. As

we stated in a similarly situated case: "If we thought any change in the applicable standard of review (and we are not intimating in any way that there will necessarily be such a change) might affect the outcome of this appeal, we would defer a decision on this appeal until the en banc petition in Denmark was resolved." Kansky v. Coca-Cola Bottling Co., ___ F.3d ___, No. 06-2042, 2007 U.S. App. LEXIS 15514 at * 7 (1st Cir. June 29, 2007). However, as we describe below, we find that plaintiffs' claim fails even under de novo review and so we need not delay our review of this issue.

2.  Reviewing the BIBP

Plaintiffs and Bowater agree that the key language with respect to plaintiffs' claims is set forth in Article I, Section 1.03 of the BIBP, labeled "Benefit Programs":

> The separate Benefit Programs that are consolidated into the Plan are listed in Appendix A.  Separate Program Documents which describe the specific benefits provided by each Benefit Program, the individuals covered by each Benefit Program and the other terms and conditions of each Benefit Program, including any contract with an Insurance Company maintained in connection with a Benefit Program, as amended from time to time, shall be incorporated herein by this reference.  The Plan supersedes and replaces any program document defining the terms of or describing a Benefit Program that is not incorporated and made part of the Plan.  If there is a conflict between the specific terms of a Program Document and the terms of the Plan, the Program Document shall control (unless contrary to applicable law), except that any terms exclusively set forth in the Plan document shall control.

-26-

(Emphasis added).

Both sides agree that plaintiffs are not covered under the terms of the BIBP. Bowater contends that Section 1.03, particularly the third (underlined) sentence, consolidates all of Bowater's benefit plans into a single plan and supersedes any plans not listed in Appendix A (plaintiffs' plans are not listed in Appendix A). Plaintiffs disagree and argue that the only thing being "superseded or replaced" are informal documents describing benefit plans listed in Appendix A. According to this reading, the excerpted language does not refer to, and thus has no effect on, plaintiffs' benefit plans.

The BIBP itself specifies that "[w]henever capitalized and used in the Plan, [particular] words and phrases shall have the respective meanings specified in this Section . . . unless the context plainly requires a different meaning." Because two of these terms play an important role in plaintiffs' interpretation of the BIBP, we include their defined meanings here:

> **Benefit Program** means a separate welfare program that is sponsored by an Employer and which forms part of the Plan and is incorporated herein by reference.

> **Program Document** means the written summary of the terms of each separate Benefit Program, that may consist of a summary plan description, separate plan document and/or Insurance Company contract or certificate.

The heart of the debate concerns the third sentence of Section 1.03 and, in particular, what is being "superseded or

-27-

replaced" by its third sentence.[13]  This question, as posed by plaintiffs, turns on whether the phrase "that is not incorporated and made part of the Plan" modifies "program document" or "Benefit Program."

a.  Plaintiffs' Interpretation

Plaintiffs argue that the phrase "that is not incorporated and made part of the Plan" modifies the term "program document" and that what is being superseded are informal program documents that are not incorporated into the BIBP.  In making their case, they distinguish between the capitalized term, "Program Documents," which they describe as "formal" program documents, and the uncapitalized term, "program documents," which they characterize as "informal" program documents.  They interpret the second sentence of Section 1.03 – which uses the capitalized term – as incorporating into the BIBP the formal Program Documents associated with the benefit programs listed in Appendix A.  They interpret the third sentence – which purposefully employs the uncapitalized term – as requiring that informal documents

---

[13] Plaintiffs also contend that the first and second sentences limit the scope of the subsequent sentences to the benefit programs specifically listed in Appendix A.  Neither of the benefit programs under which plaintiffs seek recovery appear in the Appendix. Plaintiffs specifically argue that the second sentence clarifies that only formal Program Documents that describe a Benefit Program listed in Appendix A are to be incorporated.  Bowater argues that while these sentences specify that the benefit programs listed in Appendix A are incorporated into the BIBP, they do not restrict the scope of the subsequent sentences to programs listed in that appendix.

associated with the benefits programs listed in Appendix A be superseded or replaced by the terms of the BIBP. On this reading, the superseded materials are informal documents – such as information brochures and handouts describing plan benefits – as distinguished from official "Program Documents." Thus, the overall effect of these three sentences is to incorporate into the BIBP the formal program documents of all benefit programs listed in Appendix A and to supersede any inconsistent terms and conditions contained in informal documents describing those same programs. According to plaintiffs, this language has no effect on any benefit programs - like those at issue in this case - that are not listed in Appendix A.

Plaintiffs also argue that their interpretation of the BIBP preserves the defined meaning of the capitalized term "Benefit Program." This is so because "Benefit Program" refers only to benefit programs listed in Appendix A. If the phrase, "that is not incorporated and made part of the Plan" modifies "Benefit Program" – as Bowater contends – then it strips the capitalized term of its contractually provided meaning because a benefit program cannot be both incorporated under the BIBP (as the term's capitalization suggests) and "not incorporated and made part of the Plan" (as the modifying clause suggests).

Plaintiffs' construction of Section 1.03 reflects the proposition that it would be reasonable for a company to attempt to

eliminate possibly inconsistent references to its plans, or imprecise use of plan terms, by limiting the relevant documents to those formally generated. See, e.g., Health Cost Controls of Ill., Inc. v. Washington, 187 F.3d 703, 712 (7th Cir. 1999) (noting that "in ERISA land[] often the terms of an ERISA plan must be inferred from a series of documents none clearly labeled as 'the plan'"). However, such informal documents generally contain language clarifying that they contain merely a "summary" of the plan terms and that the actual agreement contains the operative terms. Id. Thus, the need expressly to exclude such documents from being considered part of the consolidated plan is not compelling.

Moreover, plaintiffs' argument that the critical phrase ("that is not incorporated and made part of the Plan") modifies "program document" is weakened considerably by the fact that the modifying phrase comes after the intervening phrase "defining the terms of or describing a Benefit Program." The grammatical "rule of the last antecedent" – which was used by the Supreme Court in Barnhart v. Thomas, 540 U.S. 20, 26 (2003), and which provides that a modifying phrase "should ordinarily be read as modifying only the noun or phrase that it immediately follows," id. – suggests that the phrase modifies "Benefit Program" rather than "program document." Thus the sole virtue of plaintiffs' interpretation is that it preserves the defined meaning of the capitalized term "Benefit Program" in the third sentence of this section.

b.  Bowater's Interpretation

Bowater reads the third sentence as providing that any benefit program not incorporated into the consolidated plan is superseded and replaced by the BIBP.  This reading has the effect of consolidating all outstanding Bowater plans into a single plan under the terms and conditions of the BIBP.  Thus, according to Bowater, the superseded program documents are those describing unincorporated benefit programs, not informal documents describing incorporated benefit programs.  Because the plan supersedes and replaces the program documents describing unincorporated benefit programs, it effectively terminates those programs as well. Bowater emphasizes that this interpretation squares with the intention stated on the first page of the BIBP – titled "Establishment and Purpose" – that "[a]ll Benefit Programs offered under the Plan shall constitute a single plan for purposes of the annual reporting requirements of the [Internal Revenue] Code and ERISA."  Its interpretation is also  grammatically superior to plaintiffs' because the modifying phrase ("that is not incorporated and made part of the Plan") directly follows "Benefit Plan" rather than "program document," suggesting that the phrase is referring to benefit plans that are not being incorporated into the Plan.

As plaintiffs point out, however, Bowater's interpretation seems to conflict with the BIBP's own definition of "Benefit Program," which "means a separate welfare program that is

sponsored by an Employer and which forms part of the [BIBP]." Nonetheless, as the plan itself explains, such capitalized terms "shall have the respective meanings" defined in the contract "unless the context plainly requires a different meaning." Here, Bowater argues that we must read the term "Benefit Program" in the context of the modifying phrase "that is not incorporated and made part of the Plan."

Finally, Bowater casts doubt on the sharp distinction plaintiffs draw between formal "Program Documents" and informal "program documents." This distinction is at the heart of plaintiffs' argument that the contested sentence of the BIBP intends the BIBP to supersede and replace informal program documents of benefit programs incorporated in Appendix A. This distinction is not borne out by the definition of "Program Documents," which includes any "written summary of the terms of each separate Benefit Program," and specifies that such a summary "may consist of a summary plan description, separate plan document and/or Insurance Company contract or certificate." While the second sentence of this definition refers to an array of formal documents, the definition contemplates a mix of formal and informal documents. Thus, while plaintiffs' interpretation may preserve the proper usage of the defined term "Benefit Program" in the third sentence of Section 1.03, its reliance on a sharp distinction that seems inconsistent with the definition of "Program Document"

-32-

significantly weakens its appeal. Bowater also offers a plausible alternative account for its use of the uncapitalized term "program documents" in the contested sentence. Rather than signaling that "informal" documents were being superseded and replaced, Bowater explains that "program documents" remains uncapitalized because the capitalized term refers only to the program documents associated with benefit plans listed in Appendix A. Because the third sentence refers to program documents associated with benefit programs that are not incorporated into the BIBP, the more inclusive, uncapitalized term was necessary.

c. The More Persuasive Interpretation

We find Bowater's arguments significantly more persuasive than plaintiffs' for the following reasons:

(1) Given that the modifying phrase directly follows "Benefit Program" rather than "program document," Bowater's argument is consistent with the "rule of the last antecedent;"

(2) Plaintiffs' textual argument relies on the shaky foundation of a strict dichotomy between "formal" and "informal" program documents that is not supported by the BIBP's own definitions of Program Document;

(3) Plaintiffs' argument based on the Plan's capitalization scheme ignores the important language in the Plan

-33-

itself explaining that the defined terms should not be given effect where context requires otherwise;

(4) Plaintiffs' account of what the third sentence of Section 1.03 accomplishes – superseding and replacing informal documents – is unpersuasive, given that such informal documents tend explicitly to state that, where their terms conflict with the terms in the actual Program Documents, the latter are controlling;

(5) Bowater's explanation – that any program documents related to plans not incorporated in the BIBP were superseded and replaced by the terms of the BIBP – is more logically consistent with the purpose behind the BIBP's adoption: to consolidate Bowater's many benefit plans into a single plan; and

(6) Focusing on the plain language of the disputed provision and putting aside for the moment the technical arguments of the parties, that provision expressly states that it "supersedes and replaces" program documents associated with unincorporated benefit programs – that is, any benefit program that is not listed in Appendix A to the BIBP – thereby terminating those unincorporated benefit programs. The benefit programs at issue here are not listed in Appendix A. Hence, by the plain language of the disputed provision, the benefit programs at issue have been superseded and replaced. Without intending or implying any criticism of the skillful advocacy of plaintiffs, the fact that advocacy can muster arguments that seem to impugn the clarity of

such plan language does not mean that the document's language is insufficiently clear for ERISA purposes.  See <u>Foisy</u> v. <u>Royal Maccabees Life Ins. Co.</u>, 356 F.3d 141, 147 (1st Cir. 2004) (explaining, in the context of contract interpretation, that "a mere controversy over interpretation is not, by itself, enough to create ambiguity.").  The plan at issue here conveys with the clarity required by ERISA that program documents related to unincorporated benefit plans (like plaintiffs' health plans) – and those plans as well – were superseded and replaced by the BIBP. For all of these reasons, we affirm the district court's ruling that Bowater's 2003 plan consolidation effectively terminated its responsibility for plaintiffs' health benefits.[14]

### III.

In addition to the ERISA claim applicable to all class members, retirees who were employed on an hourly basis under union contracts also seek lifetime health benefits that they claim were promised to them under the terms of their CBAs with Bowater.  Our conclusion that the BIBP ended Bowater's responsibility for the benefit plans on January 1, 2003 under ERISA has no effect on these

---

[14] Plaintiffs also seek reversal of two district court rulings that they contend erroneously reduced the number of retirees permitted to recover for lost benefits on the ERISA claim from 653 to 400 retirees. However, because the parties entered into a stipulation before the district court specifying the amount of damages to be awarded if we affirmed the district court's determination that Bowater's responsibility under the ERISA plans ended on January 1, 2003, that issue does not arise here.

claims, which arise under the LMRA.  We consider each subclass's claims in turn.  As this issue requires us to interpret a labor contract under the LMRA, our review is de novo, <u>Bath Marine Draftsmen's Ass'n</u> v. <u>NLRB</u>, 475 F.3d 14, 27 (1st Cir. 2007), and it is governed by substantive federal law, <u>Textile Workers Union</u> v. <u>Lincoln Mills</u>, 353 U.S. 448, 456 (1957).

## A.  Pre-1999 CBAs

A provision in each of the pre-1999 CBAs states that health and welfare benefits will be provided "[d]uring the term of this labor agreement."  This provision applies equally to active employees during the term of the CBA and to employees who retire during the term of the CBA.[15]  Despite this clear durational language, plaintiffs contend that all parties understood these CBAs to provide lifetime health benefits to GNP's employees.  Plaintiffs argue that Bowater's statements and actions support this shared understanding and create a latent ambiguity that requires us to look beyond the clear language of the contracts to construe the CBAs.  Plaintiffs remind us that, because we are reviewing the district court's grant of summary judgment, we must reverse if we find that plaintiffs have established a genuine issue of material

---

[15] A retired worker's labor rights are governed by the CBA under which she retired and the terms of any ERISA plans incorporated therein.  <u>See</u> <u>Senior</u> v. <u>NSTAR Elec. & Gas Corp.</u>, 449 F.3d 206, 219-22 (1st Cir. 2006).

fact that a reasonable jury could resolve in their favor. See Vélez-Rivera v. Agosto-Alicea, 437 F.3d 145, 150 (1st Cir. 2006). Even under this standard, we agree with the district court that plaintiffs have failed to identify any such ambiguity.

We have stated that "[a]n unambiguous contract must be enforced according to its terms, under both the common law and labor law." Senior v. NSTAR Elec. & Gas Corp., 449 F.3d 206, 219 (1st Cir. 2006). However, in the exceptional case, a latent ambiguity in seemingly clear contract language may require us to consider extrinsic evidence to determine the actual object of the parties' agreement. See RCI Ne. Servs. Div. v. Boston Edison Co., 822 F.2d 199, 202 (1st Cir. 1987). "An ambiguity is latent when the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." Moore v. Pa. Castle Energy Corp., 89 F.3d 791, 796 (11th Cir. 1996). For example, a contract may refer to an object by a name that denotes more than one actual thing or the parties may use a term that, while signifying one thing in common parlance, designates something particular within the industry's jargon. See AM Int'l, Inc. v. Graphic Mgmt. Assocs., 44 F.3d 572, 575 (7th Cir. 1995) (giving examples of both scenarios). The classic case of latent ambiguity is Raffles v. Wichelhaus, 2 Hurlstone & Coltman 906, 159 Eng. Rep. 375 (Ex. 1864), in which a

-37-

contract respecting a shipment of cotton to arrive from a certain port on the ship "Peerless" was found ambiguous when the parties discovered that two ships named "Peerless" had departed from the same port. We review de novo whether a contract is ambiguous. Senior, 449 F.3d at 219.

Mindful that a court may not deprive the contracting parties of the protection they sought when they embodied their agreement in writing, courts have generally allowed only "objective" evidence to establish such a latent ambiguity. That includes "evidence of ambiguity that can be supplied by disinterested third parties," AM Int'l, 44 F.3d at 575, and evidence that is uncontested between the parties, Rossetto v. Pabst Brewing Co., 217 F.3d 539, 546 (7th Cir. 2000); it excludes "the self-serving testimony of one party to the contract as to what the contract . . . 'really' means," id.

Here, plaintiffs seek to introduce extrinsic evidence of Bowater's statements and actions indicating that both parties understood that the CBAs provided lifetime benefits. In doing so, plaintiffs do not provide a plausible alternative meaning for the durational language in the contracts. Instead, they argue that the language does not mean what it says.[16] This argument goes well

---

[16] Plaintiffs acknowledge in their brief that: "A stranger to the parties, reading only the bare text of the provisions in the pre-1999 [CBAs] requiring the company to 'pay the full cost of comprehensive Medical Expense Coverage for retirees' and to do so

beyond the parameters of latent ambiguity jurisprudence, which recognizes that "there must be either contractual language on which to hang the label of ambiguous or some yawning void . . . that cries out for an implied term. Extrinsic evidence should not be used to add terms to a contract that is plausibly complete without them." Bidlack v. Wheelabrator Corp., 993 F.2d 603, 608 (7th Cir. 1993) (en banc); see also AM Int'l, 44 F.3d at 575 ("[T]he ambiguity is in the reference, that is, the connection between the word and the object that it denotes."). Plaintiffs reject this text-bound approach as "unduly narrow," arguing that Rossetto teaches that a contract is latently ambiguous not only in the multiple-reference cases like Raffles, but whenever "anyone knowledgeable about the real-world context of the agreement would realize that it might not mean what it says." Rossetto, 217 F.3d at 547.

We do not agree that Rossetto authorizes such a broad approach.[17] In that case, the Seventh Circuit found a latent ambiguity in a labor contract, due to its silence on the duration of the employer's commitment to provide welfare benefits. Id. While the lack of a durational term would ordinarily carry no

_____

'[d]uring the term of this labor agreement,' would understand the provisions as stating, by implication, that the requirement runs 'only during the term of this agreement.'"

[17] Because our court has rarely addressed latent ambiguity in contracts, this discussion relies heavily on cases from the Seventh Circuit, which has the most developed case law on the subject.

special meaning, the Seventh Circuit found that an ambiguity arose when the contract was compared to a labor contract between the same employer and a second union that was identical to the first labor contract except that it included a clear limitation on the duration of the employer's obligation. Id. at 545-46. Thus Rossetto seems to fall into the category of cases in which extrinsic evidence is allowed to fill a "yawning void . . . that cries out for an implied term." It provides no support for using extrinsic evidence to ignore a clear term stated in the contract. Indeed, the Seventh Circuit refused to consider broad-ranging extrinsic evidence to establish a latent ambiguity in a labor contract with clear durational language in the subsequent case of Cherry v. Auburn Gear, Inc., 441 F.3d 476, 484-85 (7th Cir. 2006). Focusing on the language of the contract, the court explained that: (1) "[i]solated comments by company officials . . . 'do not allow us to look beyond the written contracts agreed to by the parties,'" id. at 485; (2) statements in letters sent to employees "signifie[d] nothing concerning the meaning of the contract itself," id.; and (3) statements made by the employer during an arbitration action "are limited by the clear language of the contract, in which 'lifetime benefits' are only operable so long as they are provided for in the current [CBA]," id. at 486.

Indeed, the Seventh Circuit rejected a similar argument that a clear durational term was latently ambiguous where

plaintiffs could provide no plausible alternative meaning for the phrase:

> [Plaintiff] strives mightily to persuade us that the phrase "for the term of this Agreement" is one of those contractual terms that may seem clear on its face but in reality is ambiguous, rather like the ship Peerless or the use of specialized trade jargon. Examination of [Defendant's] own negotiators' notes would prove, according to [Plaintiff], that neither party intended to destroy the retirees' right to lifetime medical benefits when they introduced that phrase for the first time into the 1984 contract. Instead, it had a private, specialized meaning. But [Plaintiff's] argument breaks down at that point. Neither in his brief, in the [Department of Labor's amicus] brief, or at oral argument, was anyone able clearly and succinctly to tell us definitively what that specialized meaning might be.

Pabst Brewing Co. v. Corrao, 161 F.3d 434, 441 (7th Cir. 1998). See also Am. Fed'n of Grain Millers v. Int'l Multifoods Corp., 116 F.3d 976, 981 (2d Cir. 1997) (refusing to consider extrinsic evidence purporting to show that the employer had intended to provide lifetime medical benefits where the CBA contained clear durational language); District 29, United Mine Workers v. Royal Coal Co., 768 F.2d 588, 591-92 (4th Cir. 1985) (same). Accordingly, we find no ambiguity in this contract. In the face of clear durational language, we therefore conclude that plaintiffs have raised no genuine issue of material fact requiring us to overturn the district court's grant of summary judgment on the LMRA claim related to the pre-1999 CBAs.

## B.  The 1999 CBAs

The 1999 CBAs were negotiated in anticipation of GNP's sale to Inexcon.  Accordingly, they provided that, "[u]pon the date of sale, all Bowater contractual obligations except those referred to in the Inexcon offer under 'pensions' shall cease."  In the section on pensions, the agreements stated: "Bowater will retain liability for retirement benefits earned and accrued through the day of sale."  They also provided that, unless modified by the 1999 agreements themselves, the terms of the 1995 CBAs would "remain in full force and effect."  Thus, since we have already determined that the pre-1999 CBAs provided no lifetime health benefits, plaintiffs must show that the 1999 CBA provided such benefits for the first time.

Plaintiffs rely on two sources in arguing that the 1999 CBAs entitle workers to lifetime health coverage from Bowater.  They begin with language from the section of the CBAs discussing Bowater's responsibility for pension benefits, arguing that a fact finder could reasonably determine that "retirement benefits" in the sentence "Bowater will retain the liability for retirement benefits earned and accrued through the day of sale" encompasses both pensions and health benefits.  Given that the context of that sentence clearly indicates that the retirement benefits discussed relate only to pensions and that health benefits are discussed in a separate section of the agreement, we do not agree.

Plaintiffs also argue that a triable issue of fact is raised by an August 1999 side-letter agreement from Lambert Bedard, President of Inexcon, allowing retirees to "preserve their lifetime company-paid retiree health care." This agreement was drafted in response to questions raised at an August 1999 meeting between Inexcon executives and the unions regarding retirement benefits for employees eligible to retire on the date of sale – August 17, 1999 – who actually retired between August 17, 1999 and October 1, 1999. The side letter agreement extended particular retirement benefits to this narrow class of individuals, specifying that "[t]hey will also be included with current Bowater retirees, and those who are eligible on the date of closing, to preserve their lifetime company-paid retiree health care."

The parties dispute whether this document is part of the CBAs; however, we treat the document as part of the CBAs in reviewing a grant of summary judgment opposed by plaintiffs.[18] The language of this side agreement is the only possible modification of the 1995 CBAs that could give rise to an entitlement to lifetime health coverage. However, plaintiffs do not argue that this language modified the 1995 CBAs, providing lifetime coverage to retirees for the first time. Indeed, they conceded below that "the

_____

[18] Plaintiffs note that Bowater itself included the page that contained the language "preserv[ing] . . . lifetime company-paid retiree health care" for retirees as part of the 1999 CBAs it submitted to the district court as part of its motion to dismiss.

[1999 CBA] does not purport to make any 'change' to the understanding as to the duration of retiree health benefits. Rather its purpose was to confirm an existing understanding, as its use of the word 'preserve' makes clear." However, as we have already determined, the pre-1999 CBAs contained no lifetime health benefit for retirees that could be "preserved" in the 1999 CBAs. Plaintiffs thus fail to provide any language in the 1999 CBAs through which Bowater modified the terms of the 1995 CBAs to provide lifetime health coverage to GNP's retirees.

## IV.

For the reasons elaborated above, we affirm the district court's grant of summary judgment to Bowater on the LMRA claims. We find the language of the CBAs to be clear, and plaintiffs have failed to establish a latent ambiguity that requires consideration of extrinsic evidence. We also affirm the district court's partial grant of summary judgment to plaintiffs on the ERISA claim because we find that Bowater did not terminate its responsibility for ERISA plans according to the procedural requirements of the statute when it sold GNP to Inexcon in 1999. Finally, we affirm the district court's partial grant of summary judgment to Bowater on the ERISA claim because we agree with Bowater that its 2003 plan consolidation effectively ended its financial responsibility for plaintiffs' health benefits.

**Affirmed.**