# United States Court of Appeals
## For the First Circuit

---

No. 12-1129

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

SOLUTIA, INC.,

Respondent.

---

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, Local
414C/International Chemical Workers Union Council,

Intervenor.

---

No. 12-1174

UNITED FOOD AND COMMERCIAL WORKERS INTERNATIONAL UNION, Local
414C/International Chemical Workers Union Council,

Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent.

---

SOLUTIA, INC.,

Intervenor.

---

APPLICATION FOR ENFORCEMENT AND PETITIONS FOR REVIEW
OF A FINAL ORDER OF THE NATIONAL LABOR RELATIONS BOARD

————————————

Before

Lynch, <u>Chief Judge</u>,
Boudin, <u>Circuit Judge</u>,
and McConnell,[*] <u>District Judge</u>.

————————————

<u>Zachary R. Henige</u>, with whom <u>Robert J. Englehart</u>, Supervisor Attorney, <u>Lafe E. Solomon</u>, Acting General Counsel, <u>Celeste J. Mattina</u>, Deputy General Counsel, <u>John H. Ferguson</u>, Associate General Counsel, and <u>Linda Dreeben</u>, Deputy Associate General Counsel, were on brief, for the National Labor Relations Board.

<u>Hugh F. Murray, III</u>, with whom <u>Murtha Cullina, LLP</u> was on brief, for Solutia, Inc.

<u>Randall Vehar</u>, with whom <u>Robert W. Lowrey</u>, <u>David Rome</u>, and <u>Pyle Rome Ehrenberg, P.C.</u> were on brief, for United Food & Commercial Workers International Union, Local 414C.

————————————

November 2, 2012

————————————

————————————

[*] Of the District of Rhode Island, sitting by designation.

**LYNCH**, **Chief Judge**.  This labor case comes from the intersection of an employer's desire to become more competitive by reducing costs and achieving greater efficiencies by consolidating two lab operations into one, and its obligations under national labor law to bargain with the union representing the affected employees.

The National Labor Relations Board petitions for enforcement of its 2011 order finding that Solutia, Inc. had violated sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (5).  The order required Solutia to return to United Food and Commercial Workers International Union Local 414C certain work that Solutia had transferred in 2009 to another part of its worksite and to employees represented by another union.

Solutia cross-petitions for review of the Board's order, and Local 414C has intervened in support of portions of the Board's order.  Local 414C also petitions for review, attacking that part of the Board's order finding that Solutia did not violate its collective bargaining agreement ("CBA") with Local 414C.  On this point, Solutia has intervened in support of the Board.

At issue here are the legal consequences of Solutia's decision to consolidate two of its product testing labs at different locations on its worksite into one lab, which resulted in a reduction in positions and in Local 414C losing jurisdiction over

lab testing work that its members had previously performed. Solutia refused to bargain this decision with Local 414C, considering it to be a management prerogative. The Board found that the lab work transfer decision involved a mandatory subject of bargaining, so that Solutia's refusal to bargain violated the Act. It also found that the recognition clause in the CBA between Solutia and Local 414C did not, as the Union alleged, prohibit the work transfer without Local 414C's consent. Solutia now challenges the former finding, while Local 414C challenges the latter. Both parties also allege errors in the Board's remedial order.

The Board made no error of law in reaching its decision, and its findings were supported by substantial evidence in the record. We grant the Board's petition for enforcement of its order and deny Solutia's cross-petition for review. We deny Local 414C's petition for review. While there are reasons for some concern about the remedial order, there are further administrative remedial processes through which those concerns may be addressed.

I.

A. Factual Background

The facts giving rise to this case are largely undisputed.

1. The Indian Orchard Site

The relevant events took place at the 250-acre industrial "Indian Orchard Site" in Springfield, Massachusetts. A review of

-4-

the Site's history is necessary to understanding how this case arose.

Historically, two companies operated two separate plants on the Site. The plant on the west side was known as the Bircham Bend Plant, and the one on the east side was known as the Springfield Plant. The chemical workers' union, Local 414C, represented the Bircham Bend Plant employees, while the electrical workers' union, Local 288, represented the Springfield Plant employees.[1] A chain-link fence separated the two sides of the Site.

By 1963, Monsanto had acquired both plants on the Site, and it continued to operate them as separate facilities for many years, including keeping the fence up. The two unions continued to represent employees on their respective sides of the Site. In 1982, Monsanto consolidated certain salaried employees and departments onto the east side of the Site, and it took down the fence. This consolidation, however, did not result in job or work losses for hourly (union) employees on the west side. After the consolidation, Local 414C continued to represent west side hourly employees and Local 288 continued to represent east side hourly employees.

_____

[1] Each of these unions has undergone various changes in its affiliations over the years, but for the purposes of this case it is only necessary to know that each side of the Site was represented by a different union local.

Also in 1982, Monsanto and Local 414C renegotiated their CBA, which resulted in a change to the recognition clause. The 1982 clause read:

> A unit comprising of all hourly rated employees, excluding executives, office and clerical employees, guards, professional employees and supervisors as set forth in the National Labor Relations Board Certification of Representatives dated October 26, 1950, <u>for the then existing Bircham Bend Plant. This recognition clause shall be unaffected by any future consolidation of the plants at the Indian Orchard Site.</u>

Monsanto had proposed adding the first underlined clause; Local 414C agreed to that clause on the condition that Monsanto accept the second underlined sentence. This same language remained in Local 414C's CBA through the version adopted by Local 414C and Solutia in 2006, which was the version in effect when the events at issue occurred.[2]

In the years after the consolidation, Monsanto bargained with the two unions when it made changes that would affect the work

---

[2] Local 288's 1982 CBA was not in evidence. Local 288's 2006 CBA does include a recognition clause with a geographical signifier, although its language is somewhat different from Local 414C's:

> The Company recognizes [Local 288] as the sole collective bargaining agent for all production, maintenance, service and research employees, excluding [certain positions not at issue here]. The terms "employee" and "employees" as used in this Agreement shall include only those employees at that portion of the Indian Orchard Plant formerly known as the Springfield Plant for whom [Local 288] is recognized as collective bargaining agent as set forth in this Section.

available to union employees. For instance, when Monsanto built a new building that straddled the line between the east and west sides, it negotiated a "Memo of Understanding" signed by both unions that designated the building as "geographically neutral" and that allowed both unions' employees to work there. When Monsanto built two new buildings on the east side and one on the west side, it negotiated another tri-party agreement in which all three buildings were also designated "geographically neutral," with the maintenance to be performed by union members from the side where each building was located. And in 1994, Monsanto bargained for a "Memo of Understanding" with Local 288 that provided for the transfer of certain sample testing work from a Local 288 lab to a Local 414C lab.[3]

In 1997, Monsanto spun off its chemical manufacturing arm into a new affiliate, Solutia. Solutia took charge of the Site and maintained CBAs with Local 414C and Local 288. In 2006, Solutia negotiated a new agreement with each union that superseded the previous agreement as to the three newest buildings. These agreements allowed union employees to "cross lines" and perform maintenance, storage, and utility work in any of the three

---

[3] The parties dispute whether this 1994 agreement also involved management negotiations with Local 414C. One of Local 414C's former presidents testified that when Monsanto raised the issue with the Union, Local 414C agreed to accept any work that Monsanto might transfer to the west side, but there was no evidence in the record that formal bargaining took place.

buildings, regardless of which union had historically performed those functions. The agreements also required Solutia to allocate future staffing for the three buildings evenly among the unions. They did not change the allocation of any production or lab work.

Solutia also reached a separate agreement with Local 414C in 2006 that gave Local 414C jurisdiction over a new product line that was being produced on the west side. This agreement specifically stated that Local 414C was being granted jurisdiction "[b]ased on the current location of the [production] operation" and "only for any period of time in which" Solutia chose to locate production on the west side.

The Bircham Bend Plant historically produced resins, and Solutia continues to manufacture resins at that plant. The Springfield Plant historically used these resins to produce Saflex (or its equivalent), a strong clear plastic sheet that is used in making safety glass. Solutia continues to produce Saflex at the Springfield Plant. At the relevant times, the Bircham Bend Plant included a stand-alone building known as the West Control Lab ("WCL"), in which employees performed quality control testing and analysis on the resins produced on the west side.[4] WCL employees also performed testing on adhesives for an unrelated company,

_____

[4] Under the 1994 agreement between Monsanto and Local 288, the WCL also tested certain east side products.

-8-

Cytec, a "guest operation" under contract with Solutia. Local 414C represented the employees in the WCL.

Meanwhile, on the east side, the Springfield Plant included within its main building another lab, the Saflex Control Lab ("SCL"), in which employees performed testing on east side products. Employees in the SCL were represented by Local 288.

### 2. The Lab Work Transfer Dispute

In July 2008, Solutia began to consider consolidating lab work on all products produced at the Site into one location, the SCL. Solutia anticipated that consolidating the lab work would allow it to reduce staffing levels and thus reduce labor costs by $249,000 per year. It would also provide more work for SCL employees, whom the company thought were underutilized. Solutia also expected that moving its testing operations out of the WCL would cause Cytec to become responsible for all of the costs of operating that building, or if Cytec chose to move its testing operations elsewhere, the building could be shut down and there would be no operating costs. The transition would simply involve moving existing equipment from the WCL to the SCL, without requiring additional capital purchases. Finally, the company believed that consolidation would increase the SCL lab workers' skills because they would become knowledgeable about all stages of the testing process, not just the stage performed on their side of the Site. The company concluded that moving all testing to the SCL

would mean that work formerly performed by Local 414C employees would have to be transferred to Local 288 employees.

On March 4, 2009, Solutia management presented the consolidation plan to representatives of Local 414C. The union recorder's notes from this meeting reflect that the company stated the consolidation was being "put[] on [the] table but needs to be worked out." Joseph Coppola, Solutia's human resources director, testified that as of March 4, 2009, the decision to go through with the consolidation was already final on the local level but was awaiting approval from higher-level management. He also stated that as of this date, Solutia had already determined that it did not have to bargain the decision to consolidate with Local 414C.

The next day, Local 414C representatives met with management again and expressed their view that, under the terms of Local 414C's CBA, Solutia did not have a right to consolidate the lab work without first obtaining Local 414C's consent.

During March 2009, Coppola met more than once with Robert Bellerive, Local 414C's president, to discuss the work transfer, but the Union and the company could not agree on whether the CBA authorized the transfer without Union consent. On May 7, 2009, Bellerive and Thomas Humiston, the Union's treasurer, sent a letter to Coppola requesting that the company provide the Union with the CBA language it was relying on to conclude that it had the right to transfer unilaterally the lab work. The letter further stated

that, "[s]hould the union agree with the company's decision to take this action after reviewing the information that has been requested in this letter, the union demands to bargain this issue with the company." The letter maintained Local 414C's position that the unilateral work transfer was a violation of the CBA.

On May 27, 2009, Coppola met with Local 414C representatives and reiterated that Solutia had made the decision to consolidate the lab work. He also stated that it was Solutia's position that it did not have to bargain that decision. Coppola informed the representatives that the transfer would result in the elimination of four Local 414C unit positions. He then stated, "[f]or the record," that the company had suggested that its lawyers and the Union's lawyers meet, but the Union had refused. Bellerive testified that he had contacted the international union's president about attorneys getting involved and that he was told the union's attorneys would only intervene at the arbitration stage, after negotiations had taken place between the company and the local.

Two days later, on May 29, 2009, Coppola sent a letter to Local 414C that confirmed his statements from the May 27 meeting and informed the Union that all Solutia testing at the WCL would cease by August 31, 2009. Coppola also stated that work transferred to the SCL would "necessarily" be performed by Local 288 employees because of the terms of Solutia's CBA with Local 288. He denied that the work transfer violated Local 414C's CBA and

asserted that the decision could be made unilaterally because it fell within the CBA's "management rights" provision. Finally, Coppola wrote that Solutia would "discuss . . . any reasonable proposals [the Union] may have" with regard to the Local 414C workers "affected by" the transfer, though it would not bargain over the transfer decision itself.

On June 16, 2009, Solutia provided formal written notice to Local 414C that four positions in the WCL would be eliminated on August 2, 2009. On July 18, 2009, Solutia entered into a new CBA with Local 288 that altered the qualifications and job descriptions for SCL employees in anticipation of the consolidation.

The lab consolidation began on August 3, 2009, and was completed within two weeks. The transition involved moving equipment from the WCL to the SCL and making some construction modifications to enlarge the SCL.

Although Solutia eliminated the WCL lab positions, it did not lay off any Local 414C personnel. Some of the former WCL employees elected retirement; others bid into production jobs (which were considered less desirable because they were more physically demanding); and others began performing testing work for Cytec at another location on the Site. Since the transfer, testing work has not been performed in the WCL building.

On October 1, 2009, Solutia and Local 414C entered into a new CBA. The parties dispute whether the CBA negotiations

-12-

included any bargaining over the effects of the lab work transfer decision, but it appears undisputed that the CBA negotiations did not include bargaining over the decision itself.

B.   Procedural Background

On June 2, 2009, after Solutia confirmed by letter that it would not bargain the work transfer decision, Local 414C filed an unfair labor practice charge with NLRB's regional office, alleging that Solutia had violated the Act by unilaterally modifying the CBA and unilaterally transferring work out of the bargaining unit.  The next day, Local 414C also filed a grievance with Solutia alleging a violation of the CBA.  On June 19, 2009, Solutia denied Local 414C's grievance, for the same reasons as it had stated in its May 29 letter.  Local 414C later dropped the grievance to pursue relief through its unfair labor practice charge.

On December 31, 2009, NLRB's General Counsel issued a complaint against Solutia.  The case was tried before an administrative law judge ("ALJ") on April 8 and 9, 2010.  The ALJ issued his decision on July 30, 2010.  His specific findings and conclusions will be detailed below as relevant to each issue in the present petitions.  In short, however, the ALJ found that Solutia (1) did not violate the CBA, but (2) did violate the Act by refusing to provide an opportunity to bargain over a mandatory subject of bargaining.  As remedies, the ALJ ordered Solutia to

take the following actions: (1) restore the WCL to the status quo ante as of August 1, 2009; (2) offer full reinstatement to current or former WCL employees who had been reassigned or had retired as a result of the consolidation, and "make whole" any such employees who had lost earnings or benefits as a result; (3) remit contributions Solutia would have made on such employees' behalf to retirement, 401(k), and/or health care funds; (4) reimburse Local 414C for union dues that would have been deducted from such employees' salaries; (5) bargain with Local 414C before implementing any similar changes in the future;[5] and (6) post notice at the Site.

Solutia filed exceptions to the ALJ's decision and remedies with the Board, and NLRB's General Counsel and Local 414C filed cross-exceptions. On July 15, 2011, a three-member panel of the Board issued its decision and order adopting the ALJ's decision in all relevant respects.[6]

On January 23, 2012, NLRB petitioned this court for enforcement of its July 15, 2011 order. Solutia cross-petitioned for review of the order on February 2, 2012. That same day, Local

---

[5] This element appears in the ALJ's "Remedy" section, but it does not appear in the "Order" section. The Order does require Solutia to cease and desist from "[f]ailing and refusing to bargain" with Local 414C over the lab transfer decision and its effects.

[6] The panel made only two minor changes: it revised the ALJ's ordered method for computing interest, and it revised some specifics in the order for posting notice.

414C moved to intervene on the Board's behalf; that motion was granted on February 16, 2012.

Meanwhile, also on February 2, 2012, Local 414C filed its petition for review of the July 15, 2011 order. Solutia moved to intervene on the Board's behalf on February 22, 2012, and that motion was granted on March 7, 2012.

On March 14, 2012, this court granted NLRB's motion to consolidate the two cases.

II.

We begin by addressing the Board's finding that Solutia violated sections 8(a)(1) and (5) of the Act, 29 U.S.C. § 158(a)(1), (5), which is the subject of the Board's petition for enforcement and Solutia's cross-petition for review. We conclude that the Board did not err in the standard it applied in reaching its decision and that its findings were supported by substantial evidence.

A.  Standard of Review

The Board's factual findings are conclusive on this court if they are "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(e). This court will uphold the Board's construction of the Act so long as the interpretation is "reasonably defensible." Pan Am. Grain Co. v. NLRB, 558 F.3d 22, 26 (1st Cir. 2009) (quoting Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1979)) (internal quotation marks omitted).

-15-

B.  Mandatory Subject of Bargaining

Solutia first seeks to prevent enforcement of the Board's order by arguing that the Board's determination that Solutia failed to provide an opportunity to bargain over a mandatory subject of bargaining was reached using an incorrect legal standard and that it was not supported by substantial evidence.  The applicable standard turns on the nature of Solutia's decision and whether it was about a "term or condition of employment" subject to mandatory bargaining.

Section 8(a)(5) of the Act makes it an unfair labor practice for an employer to refuse to bargain collectively with its employees' representatives, see 29 U.S.C. § 158(a)(5), and section 8(a)(1) makes it an unfair labor practice for an employer to interfere with any of an employee's rights under the Act, see id. § 158(a)(1).  The duty to bargain collectively comprises, in part, "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment."  Id. § 158(d).  Under the Act, an employer's decisions about "wages, hours, and other terms and conditions of employment" are mandatory subjects of bargaining. NLRB v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 349 (1958).  An employer violates section 8(a)(5) when it makes a unilateral change to a term or condition of employment without

-16-

first bargaining to impasse with the union.  Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 198 (1991).  The Board receives "considerable deference" in its determinations of what constitutes a "term or condition" of employment.  Ford Motor Co., 441 U.S. at 495.

Solutia contends that transferring the lab work was a change in the scope or direction of its business and that the Board should have used the tests set forth in First National Maintenance Corp. v. NLRB, 452 U.S. 666 (1981), and Dubuque Packing Co., 303 N.L.R.B. 386 (1991), enforced sub nom. United Food & Commercial Workers Int'l Union, Local No. 150-A v. NLRB, 1 F.3d 24 (D.C. Cir. 1993).  In contrast, the Board found that the transfer was not a change in direction or scope of the enterprise, but a movement of the same unit work to different employees within the same facility, which is not covered by Dubuque and which is a mandatory subject of bargaining.

In First National, the Supreme Court identified three categories of management decisions: those that are "almost exclusively" about an aspect of the employment relationship, such as decisions affecting work rules and production quotas; those that "have only an indirect and attenuated impact on the employment relationship," such as decisions about advertising and product design; and those that have a "direct impact on employment" but "ha[ve] as [their] focus only the economic profitability" of the

-17-

company. 452 U.S. at 677. This third type of decision includes those that involve "a change in the scope and direction of the enterprise." Id. When it comes to decisions in the third category, the Court stated that bargaining should be mandatory "only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." Id. at 679.

In Dubuque, the Board established a test for deciding "whether a decision to relocate unit work is a mandatory subject of bargaining," holding that such a decision was within the third First National category. 303 N.L.R.B. at 390. The Board held that the initial burden in a relocation case rests with NLRB's General Counsel, who must "establish that the employer's decision involved a relocation of unit work unaccompanied by a basic change in the nature of the employer's operation." Id. at 391. If the General Counsel meets that burden, a prima facie case has been established that the relocation is a mandatory subject of bargaining. Id. The employer can then make out a defense to the prima facie case by showing that (1) "labor costs (direct and/or indirect) were not a factor in the decision"; or (2) "even if labor costs were a factor . . . , the union could not have offered labor cost concessions that could have changed the employer's decision to relocate." Id.

However, if an employer's transfer of work outside the bargaining unit is in the nature of an "allocation" rather than a

"relocation," the Board has held that the decision is subject to mandatory bargaining regardless of whether it focuses on the company's profitability. See, e.g., Westinghouse Elec. Corp., 313 N.L.R.B. 452, 453 (1993). The Board derives this principle from the Supreme Court's decision in Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203 (1964), in which Justice Stewart's influential concurrence[7] identified "assignment of work among potentially eligible groups within the plant" as a matter "recognized as [a] subject[] of compulsory bargaining." Id. at 224 (Stewart, J., concurring).

The Board has interpreted this rule in a case that bears a striking resemblance to Solutia's. In Westinghouse Electric Corp., 313 N.L.R.B. 452, the employer made a unilateral decision to close a laboratory on the west side of its facility and consolidate the work in a more modern and efficient laboratory on the east side, whose workers were represented by a different bargaining unit. Id. at 452. The Board in Westinghouse concluded that "a shift of work from a group of employees in one building on an employer's corporate premises to a group of employees in another employer-owned building at the same site is not the kind of

_____

[7] The Court relied in significant part on Justice Stewart's Fibreboard concurrence when it formulated its rule in First National. See 452 U.S. at 676-79.

relocation which we dealt with in Dubuque."[8]  Id. at 453.  Rather, in this situation -- where there was no change in the scope or direction of the business, the type of work being performed, or the site where the work was performed -- the decision was necessarily a mandatory subject of bargaining.  Id.  Relying on Westinghouse, the Board in this case concluded that Solutia's work transfer was an allocation decision subject to mandatory bargaining.[9]

Solutia argues that it was error for the Board to apply the Westinghouse rule because, as a factual matter, the lab work transfer did constitute a change in the scope or direction of Solutia's business.  This difference, it argues, should have triggered the Dubuque burden-shifting analysis.  The argument fails.  There is substantial evidence to support the Board's conclusion that the lab work transfer at the Site did not constitute a change in the scope or direction of Solutia's

_____

[8] In Dubuque, the employer had relocated work from a facility in Iowa to a facility in Illinois.  303 N.L.R.B. at 387.

[9] The Board also argues before this court that the work transfer was a mandatory subject of bargaining under two other theories.  First, it argues that when labor costs are a factor in a mixed-motive layoff decision, that decision is a mandatory subject of bargaining.  See Pan Am. Grain Co. v. NLRB, 558 F.3d 22, 27-28 (1st Cir. 2009) (citing NLRB precedent to this effect and affirming Board's decision that employer was required to bargain over layoffs motivated in part by labor costs and in part by modernization).  Second, it asserts that where an employer's economic motives for layoffs are separable from any change in the scope of the business's operation, the decision to make layoffs is a mandatory subject of bargaining.  Because these theories were not part of the ALJ's or Board's decisions, we do not review them.

-20-

business, and thus that the Westinghouse rule, rather than the Dubuque analysis, was the applicable standard.

Solutia's scope-or-direction argument rests on its factual assertion that consolidating the lab work in the SCL was a fundamental change to the way in which its products would be tested at the Site. Solutia's evidence before the Board does not come close to compelling this conclusion, and largely undercuts it. The evidence shows that the company did not plan for SCL employees to perform more or different tests than those formerly performed in the WCL; rather, Solutia expected that having SCL employees test both west side and east side products would improve their ability to "troubleshoot and respond to problems," and a primary motivation was a reduction in the number of jobs needed to perform the tests. The Board could easily conclude that this sort of skill improvement does not represent a fundamental change in the company's operations.

Additionally, Solutia's documents, as well as testimony from its plant manager, David Lahr, showed that employees in the consolidated SCL would use the same equipment that had been used in the WCL. In fact, a WCL employee trained the people who were to instruct the SCL employees on how to perform the tests, suggesting that there was no substantive difference between how the WCL employees had tested resins before the consolidation and how the SCL employees were expected to test them afterward. Solutia is

-21-

still producing all of the same products at the Site as it did before August 2009. Now it merely has different (and fewer) employees performing the quality and safety testing on those products.

The Board did not err in applying the Westinghouse rule in this case.[10]

---

[10] The Board also concluded that even if the Dubuque analysis had applied, the outcome of the case would have been the same. Solutia argues that, under a properly applied Dubuque analysis, there would not have been substantial evidence to support a finding of statutory violation. Solutia asserts that it made out the Dubuque defense because the kinds of labor savings it anticipated from the work transfer were not of the kind properly considered under First National, and thus "labor costs" as such were not a factor in its decision. And even if labor costs were a factor, it argues, the Union could not have offered any concessions to change Solutia's decision. Although we hold that the Board was not required to apply the Dubuque analysis, we agree with the Board's conclusion that Solutia would fare no better under Dubuque.

There is substantial evidence to support a finding that the General Counsel made out a prima facie case for mandatory bargaining under Dubuque. As described in the text, the Board could have found that Solutia's work transfer did not involve a change in the scope or direction of its business, and the company did "relocate" work out of the bargaining unit. See Dubuque, 303 N.L.R.B. at 391.

Solutia's argument that labor costs were not a factor in its decision is contradicted by the record. Coppola specifically testified that labor costs played a role in the consolidation decision. Solutia expected to save almost $250,000 in salaries from eliminating WCL positions. Solutia also anticipated that the work transfer would remedy the underutilization of the SCL workers, which the company considered a labor cost issue. First National contemplated that "labor costs" would include not just per-person costs such as wages but also elements such as "size of workforce and production goals." Furniture Rentors of Am., Inc. v. NLRB, 36 F.3d 1240, 1249 (3d Cir. 1994).

Solutia does not point to any specific evidence supporting its contention that there were no possible concessions Local 414C could have offered to change its decision, relying instead on its own asserted reasons for why it decided to consolidate work in the SCL.

-22-

Solutia then argues that the Board, by relying on Westinghouse, incorrectly created a "virtual per se rule" for work consolidation cases that is incompatible with the balancing approach of First National. Solutia relies on Furniture Rentors of America, Inc. v. NLRB, 36 F.3d 1240 (3d Cir. 1994), and NLRB v. Wehr Constructors, Inc., 159 F.3d 946 (6th Cir. 1998), for the proposition that the Board cannot rely on Westinghouse here because it must perform the First National balancing anew in every case that involves a third-category decision. We disagree. Solutia's reading of these cases is inaccurate. Both involved employers' decisions to subcontract, and both denied enforcement of NLRB orders that broadly applied Fibreboard to such decisions without looking to the business circumstances that attended them. See Furniture Rentors, 36 F.3d at 1247-50; Wehr Constructors, 159 F.3d at 951-55. Neither case implied that the Board could not look to its own precedent in determining whether a specific type of factual situation had previously resulted in a finding of a mandatory duty to bargain. The Board's reliance on Westinghouse in Solutia's case

The Board rightly pointed out that Solutia bore the burden on this issue, and the evidence does not compel a finding that the Board was wrong to conclude that Solutia failed to meet its burden. See Comar, Inc., 349 N.L.R.B. 342, 359 (2007) (finding that employer's "self-serving and conclusory testimony" that decision could not have been altered by bargaining was "insufficient to establish" that changes at issue were not a mandatory subject of bargaining, and citing cases).

-23-

was much narrower than the Board's reliance on Fibreboard in either of the cases that Solutia cites.

Here, the Board did attend to the facts of Solutia's case, and based on the record, it concluded that Solutia's actions fell within the category of reallocation decisions subject to the mandatory duty to bargain. See, e.g., Regal Cinemas, Inc. v. NLRB, 317 F.3d 300, 310-12 (D.C. Cir. 2003) (approving application of Westinghouse analysis to work allocation decision that did not involve a change in the nature of the work, and rejecting argument that Board's use of Westinghouse created a per se rule); Westinghouse, 313 N.L.R.B. at 453; Holmes & Narver, 309 N.L.R.B. 146, 147 (1992) ("[O]ur decision here does not purport to establish a rule as to all layoffs.  We are dealing with layoffs that are made in connection with a decision to continue doing the same work with essentially the same technology, but to do it with fewer employees by virtue of giving some of the employees more work assignments.").  The findings underlying this determination were supported by the record, and the Westinghouse interpretation of the mandatory duty to bargain is reasonably defensible.  See Regal Cinemas, 317 F.3d at 312.

C.  Purported Waiver by the Union of the Right to Bargain and Adequacy of Opportunity to Bargain

Solutia next argues that it cannot be liable under the Act because Local 414C waived its right to bargain the work

-24-

transfer decision and Solutia fulfilled its statutory obligation to bargain the effects of that decision. We conclude that there is substantial evidence to support the Board's findings that Local 414C had not waived its right to bargain and that Solutia had failed to provide an adequate opportunity to bargain the effects.

1. Bargaining the Decision

"If an employer gives a union advance notice of its intention to make a change to a term or condition of employment, 'it is incumbent upon the [u]nion to act with due diligence in requesting bargaining' in order to avoid waiving any of its claims under the NLRA." Regal Cinemas, 317 F.3d at 314 (alteration in original) (quoting Golden Bay Freight Lines, 267 N.L.R.B. 1073, 1080 (1983)). However, "[a] union is 'not required to go through the motions of requesting bargaining[]' . . . if it is clear that an employer has made its decision and will not negotiate." Id. (quoting Gratiot Cmty. Hosp., 312 N.L.R.B. 1075, 1080 (1993)). Neither party contests these basic principles; their disagreements are about whether Local 414C met the first standard and/or falls into the exception stated by the second standard.

Solutia contends that Local 414C waived its right to bargain the work transfer decision because the Union did not request decision bargaining. Solutia argues that Local 414C insisted, from the time it learned about the proposed consolidation, that the work transfer would violate the CBA, and

thus the Union did not even attempt to bargain the decision. Solutia also maintains that there was insufficient evidence to support the Board's conclusion that Local 414C did not have to demand bargaining because Solutia presented the decision as non-negotiable.

The Board's conclusion that Local 414C timely requested to bargain the work transfer decision rests primarily on Local 414C's letter of May 7, 2009.[11] The Union's letter maintains its previously stated position that the work transfer would violate the CBA, but it also states that in the event Local 414C "agree[s] with the company's decision to take this action," the Union "demands to bargain this issue." This language is fairly susceptible of two readings: (1) if the Union agrees that the transfer would not violate the CBA, then it demands to bargain the entire "issue" (both decision and effects); or (2) if the Union agrees that management has authority to make the decision unilaterally, then it demands to bargain the effects. Solutia assumes that this second reading is required and supports its argument. We do not address that because the Board's reading is adequately grounded in the record.

---

[11] The Board found that the record was unclear as to whether the Union, via Bellerive's meetings with Coppola, had requested bargaining before that date.

The Board apparently adopted the first meaning, and Solutia has not pointed to evidence showing that the second meaning is the only correct one. Bellerive testified that at the March 5, 2009 meeting with management and in his meetings with Coppola before the May 7 letter, he repeatedly told Coppola that the work transfer decision was a "negotiable item" that should be addressed in upcoming CBA negotiations. While the position that Bellerive communicated to Coppola relied on CBA bargaining rather than on a separate statutory duty to bargain, it was clear that Local 414C was asking to bargain regarding the decision. Bellerive's testimony supports the Board's conclusion that the May 7 letter meant that the Union was demanding to bargain the decision in the event it agreed that the CBA did not otherwise prohibit the transfer.

To support its argument, Solutia highlights a line in the notes from the May 27, 2009 meeting, in which Bellerive stated that he did not "want the company to tell employees the Union is negotiating." But this statement does not shed light on the issue of whether the Union had demanded decision or effects bargaining, or both, or neither. In fact, it would be reasonable to infer that, given the Union's insistence that Solutia could not make the decision unilaterally, the Union did not want the company to suggest to employees that the Union had acquiesced in the decision and was already bargaining the effects.

The authorities relied on by both Solutia and the Board do not address a situation in which one reason for a union's purported failure to request decision bargaining is the union's clearly communicated position that the decision is prohibited regardless of bargaining. At least one court has held that under somewhat similar circumstances, there was no waiver. See Patent Office Prof'l Ass'n v. Fed. Labor Relations Auth., 872 F.2d 451, 455-56 (D.C. Cir. 1989) (holding that federal employee union's request to employer agency that agency halt decision pending a determination of its lawfulness "did not waive [the union's] right to bargain, as much as initiate it"). Based on Bellerive's testimony and the text of the May 7 letter, there was substantial evidence for the Board to conclude that Local 414C requested decision bargaining.[12]

---

[12] There is some authority to suggest that, even if the May 7 letter were not by itself considered a demand for decision bargaining, Local 414C's unfair labor practice charge of June 2, 2009 could constitute a bargaining demand, to the extent it clarified the letter. See RC Aluminum Indus., Inc. v. NLRB, 326 F.3d 235, 243 (D.C. Cir. 2003) (noting that "[a] line of Board cases holds that the filing of an unfair labor practice charge may cure an inadequate request and give rise to a valid bargaining demand"); cf. Patent Office Prof'l Ass'n v. Fed. Labor Relations Auth., 872 F.2d 451, 455-56 (D.C. Cir. 1989) (holding that union's filing of an unfair labor practice charge after informing employer that it believed employer's action to be contrary to law put employer on notice that union would seek to bargain the action). The Board's decision in this case adverted briefly to this possibility, stating that Local 414C had requested decision bargaining "both by its May 7 letter to [Solutia] and by its subsequent unfair labor practice charge and grievance." The Board does not pursue this line of argument in its petition for enforcement.

Moreover, even if Solutia were correct that the May 7 letter cannot be read as a demand for decision bargaining, there is ample evidence to support the Board's conclusion that Local 414C did not need to request decision bargaining because the decision was presented as a "fait accompli." See Regal Cinemas, 317 F.3d at 314 (quoting Int'l Ladies' Garment Workers Union v. NLRB, 463 F.2d 907, 919 (D.C. Cir. 1972)). Coppola testified that the company had decided before March 2009 that it had no duty to, and would not, bargain the work transfer decision with Local 414C. Lahr also testified that the decision was final at least as of May 7, 2009. During the May 27, 2009 meeting, Solutia announced to the Union that it did not believe it had an obligation to bargain the decision, but both Bellerive's and Coppola's testimony suggests that Coppola had already communicated to Bellerive during their meetings in March that the company believed the CBA authorized a unilateral work transfer. This evidence supports the conclusion that any request to bargain the decision would have been futile.

Solutia counters that, although it had determined that it had no duty to bargain even before informing the Union of the plan, it did not confirm this position with the Union until late May, and Local 414C had not requested decision bargaining before then. It is true that in order for a situation to fall within the "fait accompli" exception, it must be "clear" to the union that the employer will not negotiate. Id. Substantial evidence supports

-29-

the Board's conclusion that Solutia's position was clear to Local 414C before the May 29 letter. Coppola himself testified that in March 2009 he and Bellerive "basically confirmed [their] disagreement, as to the company's right to move the work." Furthermore, even if Solutia's position had not been confirmed before May 29, 2009, we do not accept its proposition that the period between March 4, 2009 (when Local 414C first learned of the work transfer plan) and May 29, 2009 (when it definitively learned that the plan was a fait accompli) was so long as to cause the Union to waive its right to bargain the decision. Cf. G. Heileman Brewing Co. v. NLRB, 879 F.2d 1526, 1532 (7th Cir. 1989) (union's delay of one month before requesting bargaining, while "unnecessar[y]," did not trigger waiver).

Finally, Solutia argues that the "management rights" clause in its CBA with Local 414C waived the Union's right to bargain the decision.[13] That provision reads:

> The Union recognizes that subject to the provisions of this Agreement, the operation of the plant, including but not limited to the right to employ, promote, lay-off, discipline or discharge for just cause, and to judge the qualifications and competency of all employees, are reserved by and vested in the Company.

---

[13] Solutia refers to this argument in only one paragraph of its brief before this court. We bypass whether Solutia's brief has waived the issue and deal with it on the merits.

This was a primary argument Solutia advanced before the ALJ and Board, but a secondary argument in its petition to this court. The Board concluded that the management rights clause did not cover the type of decision at issue here and thus could not preclude the Union's right to bargain the decision.

It is difficult, from our perspective, to know why Solutia acted with such assurance that it had no obligation to bargain the decision. Coppola's belief that Solutia did not have to bargain the decision was based on consulting Local 414C's and Local 288's CBAs. The CBA language was cited in Solutia's May 29, 2009 letter to Local 414C and in Solutia's denial of Local 414C's grievance. Just as the Union relied on the CBA for its insistence that Solutia could not transfer the work, Solutia relied on the CBA for its insistence that it could.[14]

Under the rule in this circuit set forth in <u>Bath Marine Draftsmen's Ass'n</u> v. <u>NLRB</u>, 475 F.3d 14, 25 (1st Cir. 2007), the standard for evaluating a CBA-based defense to a section 8(a)(5) claim is the "contract coverage" test. That test looks to whether the parties have negotiated a provision in their CBA that

---

[14] In its brief to this court, Solutia makes the confusing suggestion that the management rights clause "combine[s]" with Local 414C's actions to result in a waiver of the right to bargain the decision. <u>But see</u> <u>NLRB</u> v. <u>U.S. Postal Serv.</u>, 8 F.3d 832, 836 (D.C. Cir. 1993) (noting that contract coverage and waiver are "analytically distinct" because, if a subject is covered by a CBA, the union is deemed to have exercised its right to bargain that subject and thus cannot be said to have waived the right).

establishes the parties' rights regarding an otherwise mandatory bargaining subject.[15]  Id.; see NLRB v. U.S. Postal Serv., 8 F.3d 832, 836 (D.C. Cir. 1993).  The Board, applying the contract coverage test, found that the plain language of the clause and the parties' bargaining history demonstrated that the lab work transfer was not within the coverage of the management rights clause.  It determined that there was no sound arguable basis for Solutia's interpretation of the clause.

The parties have not briefed the question of what standard of review we should apply to the question of contract coverage and the Board's interpretation of the CBA.[16]  Regardless of whether we interpret Solutia and Local 414C's CBA de novo[17]  or

_____

[15] The Board noted that Solutia's defense would also fail under NLRB's more stringent "clear and unmistakable" waiver test, Provena Hosps., 350 N.L.R.B. 808 (2007), but we do not address that finding because it does not apply the controlling test in this circuit.

[16] The Board has limited authority to interpret a CBA in order to resolve a section 8(a)(5) defense. See Bath Marine, 475 F.3d at 25; U.S. Postal Serv., 8 F.3d at 837.  However, federal labor laws establish that courts and arbitrators generally are the primary interpreters of labor contracts. See U.S. Postal Serv., 8 F.3d at 837.  This court has implied that the Board's interpretation of a CBA in the section 8(a)(5) context should be subject to de novo review.  See Bath Marine, 475 F.3d at 25.  But see id. at 29-30 (Lynch, J., concurring in the judgment) (noting that Bath Marine did not actually involve a section 8(a)(5) claim and disputing that the imposition of de novo review was justified in that case).

[17] We have stated elsewhere that our interpretation of a labor contract under the Labor Management Relations Act, 29 U.S.C. § 141 et seq., is de novo. Coffin v. Bowater Inc., 501 F.3d 80, 97 (1st Cir. 2007).  However, that case arose from an appeal in a putative class action suit, id. at 83, and did not involve any question of administrative deference.

apply some form of deference to the Board's decision,[18] we reach the same conclusion in this case. The management rights clause did not authorize Solutia's unilateral work transfer.

"In determining whether a subject is covered by a CBA, . . . we will consider whether the parties bargained over the mandatory subject at issue." Bath Marine, 475 F.3d at 25. The plain language of the management rights clause would not suggest to any reader that the geographical allocation of work had been one of the bargaining topics when Solutia and Local 414C negotiated this clause. As the Board noted, the illustrative list of "operation[s]" reserved to management under the clause describes decisions of only one type: "routine employment actions" concerning individual employees, such as promotions and discipline. See Regal Cinemas, 317 F.3d at 312-13 (management rights clause that reserved employer's right to "introduce new or improved work methods . . . processes and procedures" and "change or eliminate existing . . . procedures or work," id. at 312 (alterations in original), did not cover employer's decision to remove work from bargaining unit employees and reassign it to managers). The language of the management rights clause clearly does not encompass cross-plant

_____

[18] The Board's conclusion that the management rights clause did not cover the lab work transfer was not based solely on the contract language. It also took into account the parties' bargaining history. The Board's findings in this regard were supported by substantial evidence. So the question of whether there should be any deference may depend on the justification for the Board's decision.

work consolidation and elimination of unit positions.  Compare U.S. Postal Serv., 8 F.3d at 838 (management rights clause reserved to employer the right "[t]o determine the methods, means and personnel by which [its] operations are to be conducted" (second alteration in original)).

Further, the bargaining history shows that Solutia (and its predecessor, Monsanto[19]) had previously bargained similar issues under the same management rights language.  Solutia's bargained 2006 agreement with Local 414C regarding the new product line included an explicit provision addressing Solutia's future right to remove work assigned to the west side, which Solutia would not have needed to include if it believed that such a move were already authorized by the CBA.  The series of agreements between Monsanto and both unions regarding work in the new buildings, as well as the agreements between Solutia and the unions regarding the ability to "cross lines," provide additional evidence of the employer's beliefs about the scope of the management rights clause.[20]  See

---

[19] The management rights clause has been part of Local 414C's CBA since at least 1979.

[20] The 1994 agreement between Monsanto and Local 288 represents an instance of bargaining over the precise type of action at issue here: removing work from one unit and transferring it to the other unit.  This agreement was, of course, governed by Local 288's CBA rather than Local 414C's.  Nonetheless, the 1994 agreement provides evidence of the employer's historical understanding that cross-Site work allocation was a subject of negotiation with the unions.  Bellerive's testimony indicates that, although Monsanto did not formally bargain the 1994 work transfer decision with Local 414C, Monsanto did discuss the decision with the Union and the Union

-34-

Regal Cinemas, 317 F.3d at 313 (noting that bargaining history did not support employer's interpretation of management rights clause and concluding that, in light of language and history, it would not "conclude that a union would knowingly agree to a clause that would effectively permit the employer to unilaterally extinguish the bargaining unit altogether").

In sum, neither the language of the clause nor the bargaining history support the conclusion that the employer and the Union had already bargained to give the company unilateral control over the mandatory subject of allocation of work to different units within the plant. Solutia has failed to make out a contractual defense to its violation of the statutory duty to bargain the work transfer decision.

2. Adequate Opportunity for Bargaining the Effects

Solutia next argues that the Board's determination that Solutia failed to provide Local 414C with an adequate opportunity to bargain the effects of the work transfer decision was unsupported by substantial evidence. Solutia agrees that it had an obligation under the Act to bargain the effects, but it denies that it failed to offer an opportunity to do so. This is a closer question.

expressed its willingness to take on additional work provided that the company would supply additional help if needed.

The Board's finding that Solutia had not satisfied its statutory duty to bargain the effects was largely based on the finding that Solutia had not satisfied its duty to bargain the decision. The Board argues to us that, in the absence of an offer to bargain the decision, any offer to bargain the effects would have been insufficient, because an employer cannot satisfy the latter obligation without first satisfying the former. It cites its own precedent in Dan Dee West Virginia Corp., 180 N.L.R.B. 534 (1970), which stands for a different proposition: that an employer cannot use a union's refusal to bargain effects as a defense when there is an ongoing dispute about the employer's obligation to bargain the decision. See id. at 539. The Supreme Court has recognized that the duty to bargain a decision and the duty to bargain its effects are two separate obligations under the Act. See First National, 452 U.S. at 677 n.15, 686 (holding that employer had no obligation to bargain decision but did have an obligation to bargain the effects of the decision).

We are far from convinced that a per se rule, operating regardless of the underlying facts, as argued by the Board, is defensible. We also disagree with the Board's assertion that this circuit has previously adopted such a rule.[21] Nevertheless, on the

---

[21] The Board cites Soule Glass & Glazing Co. v. NLRB, 652 F.2d 1055, 1088 (1st Cir. 1981), abrogated on other grounds by NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775 (1990), for our purported adoption of a per se rule. The Board far overreads the case. Soule Glass merely states the basic proposition that "[t]he

-36-

particular facts of this case, there was substantial evidence to support the conclusion that Solutia failed to provide Local 414C with a meaningful opportunity to bargain the effects, apart from any proposed per se rule.

Solutia's argument that it did provide a meaningful opportunity first relies on Local 414C's alleged failure to request effects bargaining and its failure to respond to Solutia's letter of May 29, 2009, which stated that Solutia would "discuss . . . any reasonable proposals [Local 414C] may have" with regard to the Local 414C workers "affected by" the transfer. However, this argument overlooks the Union's May 7, 2009 letter, which stated that, should the Union "agree with the company's decision to take this action," the Union "demands to bargain this issue." The Board could reasonably find that this statement referred to bargaining both the decision and the effects or to bargaining the effects only. Under either interpretation, the May 7 letter would establish a demand for effects bargaining, at least once the CBA issue was resolved. As it happened, the CBA issue was not resolved until the parties litigated it before the Board.

_____

employer must bargain with respect to the <u>decision</u> to remove work from bargaining unit employees, not merely its effects on the employees." <u>Id.</u> (citing <u>Fibreboard</u>, 379 U.S. at 209). It says nothing about the order in which the employer must perform the bargaining, nor does it suggest that a violation of the duty to bargain a decision automatically precludes an employer from fulfilling the duty to bargain effects. It simply recognizes the fact that decision bargaining and effects bargaining are two separate duties.

Solutia falls back to an argument that certain negotiations in September 2009, which occurred in connection with Solutia and Local 414C's new CBA, actually constituted effects bargaining as to the work transfer of August 2009. The evidence supports a conclusion that the CBA-related negotiations were not in the nature of effects bargaining.

For instance, during the CBA negotiations Solutia proposed to "make whole" the employees who had been forced to take a temporary pay cut while training for the new positions into which they had transferred after the WCL closure. But Lahr testified that the purpose of this proposal was to encourage the bargaining committee to recommend ratification of the new CBA, and that the Union made clear that its acceptance of this proposal was not meant to resolve the unfair labor practice charge then pending on the work transfer issue. Gary Bordeau, a former WCL employee, testified that he had filed a grievance regarding these training wages and that the grievance was resolved through negotiations, suggesting that the "make whole" proposal was linked to this separate dispute. Finally, neither party suggested that the September 2009 negotiations touched upon the remedial issues ultimately addressed by the Board, such as the treatment of WCL employees who had retired rather than transferred. There was substantial evidence that the CBA transactions were part of a

separate set of negotiations that did not constitute effects bargaining specifically as to the lab work transfer dispute.

Finally, Solutia contends that the effects of the work transfer decision were largely determined by the CBA, and so no additional effects bargaining was necessary. This is essentially a "contract coverage" defense. But because Solutia's unilateral movement of Local 414C unit work across the geographic boundary was not authorized by the management rights provision, the general provisions of the CBA regarding the job bidding process could not have constituted ex ante bargaining over the effects of this type of decision.

## III.

Local 414C petitions for review of that part of the Board's order finding that Solutia did not violate the CBA, as opposed to its bargaining obligations under the Act. The Union seeks review of this aspect of the decision despite the finding against Solutia on the statutory ground because, if there were a CBA violation, Local 414C would have to give its consent in order for Solutia to keep the lab work at the SCL, instead of the Union merely receiving the opportunity to bargain. We find no error in the Board's conclusion and deny Local 414C's petition.

## A.  Unit Modification

Local 414C argues that the lab work transfer constituted an impermissible midterm modification of the scope of the bargaining unit.  Unit modification is a permissive, not mandatory, subject of bargaining.  Local 666, Int'l Alliance of Theatrical Stage Emps. & Moving Pictures Mach. Operators v. NLRB, 904 F.2d 47, 50 (D.C. Cir. 1990).  Permissive subjects cannot be bargained to impasse or unilaterally implemented; the consent of the other party is required to alter agreements on these subjects.  See id.; Wackenhut Corp., 345 N.L.R.B. 850, 852 (2005).

Local 414C's argument rests largely on the word "for" in its CBA's recognition clause: "A unit comprising of all hourly rated employees . . . for the then existing, Bircham Bend Plant." Local 414C argues that "for" must mean that its unit is not defined solely by geography (i.e., all employees who perform work on the west side of the Site) but also by function (i.e., all employees who perform work that contributes to the items produced on the west side of the Site).  It argues that the work transfer necessarily modified the scope of its bargaining unit because the transfer took work under Local 414C's jurisdiction -- that is, quality and safety testing "for" resin products produced at the Bircham Bend Plant -- and reassigned that work to Local 288.  The Union maintains that the resin testing was still "for" the Bircham Bend Plant despite being moved to the Springfield Plant location.

The Board found that Solutia's decision to transfer the work to Local 288 employees in the SCL did not modify the scope of the bargaining unit because the unit was geographically defined: the recognition clause says nothing about the type of work to be performed by Local 414C employees and refers only to the location where the work will be performed. The Board characterizes Local 414C's reliance on the difference between "for" and "at" as a "distinction without difference."

In applying CBAs to work transfer disputes, courts and NLRB have distinguished between "jurisdictional" clauses that define the assignment of work to union members and "scope" clauses that define who is included in the bargaining unit. Local 666, 904 F.2d at 50. The former type of clause addresses a mandatory subject of bargaining, while the latter addresses a permissive subject. Id. If a work transfer affects a unit's jurisdiction but not its scope, then the transfer does not constitute a unit modification. In such a case, the union's consent is not required and the parties may bargain to impasse over the transfer. Id.

There was substantial evidence, based on the CBA itself and on the history of the Site, to support the Board's conclusion that the transfer of work to the SCL did not modify the scope of Local 414C's unit. The wording and structure of the clause did not require the Board to give the word "for" the construction on which

-41-

Local 414C insists.  In fact, the Union puts more weight on this one word than it can bear.

The word "for" does not itself substitute for a definition of particular tasks assigned to the Local 414C unit.[22] If the parties had intended in the CBA to define the unit by the types of tasks it performs, they could have done so.  Instead, reading the recognition clause against the background of how the Site had been operated since the 1960s, it is far more reasonable to conclude that the clause defined the scope of the unit geographically, since the two unions at the Site had always been separated primarily by their location rather than by the nature of their work.

The 2006 agreement between Local 414C and Solutia regarding the new product line reinforces this understanding, as it described the grant of jurisdiction in purely geographic terms.  Local 414C would have jurisdiction over the new production work "[b]ased on the current location of the [production] operation" and "only for any period of time in which" Solutia chose to locate production on the west side.  The emphasis on the west side location in this agreement undercuts the argument that the parties

_____

[22] Indeed, to the extent that the resins produced on the west side are used to manufacture Saflex on the east side, it could be argued that all work at the Site (other than the Cytec contract work) is "for" the Springfield Plant, not "for" the Bircham Bend Plant.

understood the unit's scope in functional terms. Additionally, Bellerive testified that Local 414C employees had only ever performed work on the east side under the terms of specific agreements with the employer. These agreements, bargained with Monsanto and Solutia at various points since 1982, demonstrate a pattern of work allocation negotiations that were based on the geography of the Site. The evidence does not show that the Union had ever before claimed jurisdiction over work located on the east side based on that work being "for" the Bircham Bend Plant.[23]

The Board supportably found that the lab work transfer did not make any change to the geographical scope of the unit, and thus that the transfer at issue here was not of the type that constitutes a unit modification.

## B. Contract Modification

The Union also argues that the lab work transfer effectively modified the "consolidation" language that was added to the recognition clause in 1982: "This recognition clause shall be unaffected by any future consolidation of the plants at the Indian

_____

[23] The fact that Local 288's recognition clause contains the word "at" instead of "for" ("The term[] 'employee' . . . shall include only those employees at that portion of the Indian Orchard Plant formerly known as the Springfield Plant") is of no moment. Again, such a small word cannot support such a broad interpretation, particularly in the historical context of the Site. Local 288's CBA is only relevant in that it provides additional evidence of a Site-wide system in which union jurisdiction was defined by geography rather than by the nature of the work.

Orchard Site." Local 414C insists that this clause is "work preservation" or "protection" language that prevents the employer from moving work from the west side to the east side without Local 414C's consent. Solutia, on the other hand, interpreted the clause as permitting the transfer of work across sides of the Site so long as the transfer did not involve a modification of Local 414C's unit. On Solutia's understanding, the import of the consolidation clause was to prevent work at the Bircham Bend Plant from being performed by anyone other than Local 414C employees, not to prevent the employer from moving particular tasks from one side of the Site to the other.

Once an employer and a union agree on a CBA, one party may not unilaterally modify that CBA without the other's consent during the term of the CBA. 29 U.S.C. § 158(d); Bath Marine, 475 F.3d at 20. In determining whether an employer's action constitutes a prohibited midterm modification of a CBA, the Board must ask whether the employer had a "sound arguable basis" for interpreting the CBA as it did. Bath Marine, 475 F.3d at 22.

Local 414C argues that Solutia's interpretation of the clause lacked a sound arguable basis because it was contrary to the plain language of the clause as well as the parties' bargaining history, and it would render the clause meaningless because it would be duplicative of the "for the then existing Bircham Bend Plant" language.

The Board found that Solutia had a sound arguable basis for its interpretation, based on both the CBA's language and past practice. The Board took a different lesson from the parties' bargaining history than the one advocated by the Union. It reasoned that previous issues regarding "crossing lines" (most often involving employees rather than tasks crossing over) had been addressed by bargaining, so Solutia at most would have inferred that it had an obligation under the CBA to bargain, not an obligation to get Local 414C's consent. The Board also denied that Solutia's reading would render the clause meaningless, because if Solutia were to make a work transfer decision that did in fact modify the scope of the unit, then the consolidation language would prohibit the transfer unless the Union consented. The Board's finding is well supported in the record.

As the Board found, the history of negotiations over cross-Site work would not have required Solutia to conclude that the CBA prohibited the transfer of tasks from one unit to another without Local 414C's consent. If anything, the history suggests that Solutia had an obligation to bargain over changes to work allocation -- as the Board in fact found when it determined that Solutia had violated section 8(a)(5) of the Act. The historical understanding that Local 414C was the "west side" union and Local 288 was the "east side" union would have supported a reasonable interpretation that moving a task from west to east, without moving

any employees, would be a subject of bargaining with the Union, since it would maintain each union's representation of all employees on its respective side.

As to the redundancy argument, while Local 414C did show that Solutia's interpretation was not the only possible one, the Board correctly found that the Union's evidence was not enough to overcome the deferential "sound arguable basis" standard.

IV.

Finally, we address both Solutia's and Local 414C's attacks on the Board's remedial order. We conclude that many of these challenges are premature and the remaining ones are without merit.

Section 10(c) of the Act empowers the Board to issue "an order requiring [an entity found to be in violation of the Act] to cease and desist from such unfair labor practice" and to "take such affirmative action . . . as will effectuate the policies" of the Act. 29 U.S.C. § 160(c). The Board has "wide discretion" in selecting remedies, Pan Am. Grain, 558 F.3d at 26 (quoting NLRB v. Mount Desert Island Hosp., 695 F.2d 634, 642 (1st Cir. 1982)), and this court will enforce the Board's chosen remedies "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of

the Act," id. (quoting NLRB v. Otis Hosp., 545 F.2d 252, 257 (1st Cir. 1976)) (internal quotation marks omitted).

Solutia alleges the following errors in the Board's remedies: (1) the Board stated an improper standard for determining whether former WCL employees who retired after the work transfer would be entitled to reinstatement and back pay; (2) the order to make payments to "health care funds" could result in a windfall to some employees; and (3) it was improper to order Solutia to reimburse Local 414C for lost union dues.

Local 414C challenges the Board's denial of the following cross-exceptions that the Union filed to the ALJ's recommended remedies[24]: (1) the make-whole remedy should have included a requirement that retired employees who are reinstated need not pay back their lump-sum pension distributions, or at least a requirement that Solutia assume any adverse tax consequences of such paybacks; (2) the ALJ should have held that Solutia waived its right to present any evidence at the compliance stage regarding whether it would be unduly burdensome to re-open the WCL; and (3) the remedies should have included an affirmative order for Solutia

---

[24] Although Local 414C initially frames its remedy argument as a procedural challenge based on insufficient explanations under the Administrative Procedure Act, 5 U.S.C. § 557(c)(3)(A), the Union in fact argues that the remedy was substantively incorrect for the three reasons stated.

to bargain any future proposal to again close the WCL or transfer the WCL lab work to the SCL.

Solutia's objections (1) and (2), as well as Local 414C's objection (1), are premature. The Board may reserve issues regarding individual employees' entitlements to certain remedies, such as back pay, until a post-enforcement compliance proceeding. See Holyoke Visiting Nurses Ass'n v. NLRB, 11 F.3d 302, 308 (1st Cir. 1993). In this case, the Board specifically noted that "all parties agreed to defer fully litigating" the specifics of the reinstatement and make-whole remedies until the compliance stage. Because the parties "rested with the understanding that full litigation of the reinstatement and make whole issues would be deferred to compliance," the record is incomplete with regard to these issues, and as such, this court will not decide them.

The remaining three objections may be addressed at this stage, although they can be dispatched quickly.

First, Solutia's objection (3) is without merit. Reimbursement of lost union dues is an accepted form of remedy. See, e.g., Baltimore Sun Co., 335 N.L.R.B. 163, 170 (2001); Ogle Protection Serv., Inc., 183 N.L.R.B. 682, 682-83 (1970), enforced sub nom. NLRB v. Ogle Prot. Serv., Inc., 444 F.2d 502 (6th Cir. 1971). Under NLRB precedent, such an order is interpreted as requiring the employer to subtract the union dues reimbursement from the back pay otherwise owed to affected workers, not as

requiring the employer to pay the union out of its own funds. See Ogle Protection, 183 N.L.R.B. at 683. This obviates Solutia's argument that it cannot legally pay money to a union.

Next, Local 414C's objection (2) also fails. The Board noted that Solutia had not presented evidence of undue hardship at the complaint hearing and limited any undue hardship evidence at the compliance hearing to that which was unknown or unavailable at the complaint stage. This limitation already addresses Local 414C's apparent fear that Solutia will get a second bite at the undue hardship apple, and it was not inconsistent with the purposes of the Act for the Board to leave the door open to newly discovered evidence on this important topic.

Finally, Local 414C's objection (3) is unnecessary. The Board's finding that transferring the lab work is a mandatory subject of bargaining means that Solutia will already have an obligation to bargain any further attempt to transfer the work, with or without a specific bargaining order. A bargaining order would not change Solutia's obligations, nor prevent it from eventually bargaining to impasse and implementing the transfer.

V.

The National Labor Relations Board's petition for enforcement is granted. Solutia's cross-petition for review is denied. Local 414C's petition for review is denied.